Clayton BROWN, as guardian for and
on behalf of Clarence BROWN,
Plaintiff Below, Appellant

v.

GENESIS HEALTHCARE CORPORA-
TION; Genesis Healthcare Holding
Company II, Inc.; Genesis Health Ven-
tures, Inc. of West Virginia; Genesis
Eldercare Corporation; Genesis Elder-
care Network Services, Inc.; Genesis
Eldercare Management Services, Inc.;
Genesis Eldercare Rehabilitation Ser-
vices, Inc.; Genesis Eldercare Staffing
Services, Inc.; Genesis Eldercare Hospi-
tality Services, Inc.; Marmet SNF Oper-
ations, LLC; 1 Sutphin Drive Associ-
ates, Llc; 1 Sutphin Drive Operations,
LLC; Genesis WV Holdings, LLC;
Glenmark Associates, Inc.; Marmet
Health Care Center, Inc. n/k/a MHCC,
Inc.; Canoe Hollow Properties, LLC;
Robin Sutphin; and Shawn Eddy, De-
fendants Below, Appellees.

Jeffrey Taylor, personal representative of
the Estate of Leo Taylor, Plaintiff
Below, Appellant

v.

MHCC, Inc., f/k/a Marmet Health Care
Center; Canoe Hollow Properties, LLC;
Genesis Healthcare Corporation d/b/a
Marmet Health Care Center; Glenmark
Associates, Inc.; Glenmark Limited Lia-
bility Company I; Glenmark Properties,
Inc.; Genesis Healthcare Corporation;
Genesis Health Ventures of West Virgi-
nia, Inc.; Genesis Health Ventures of
West Virginia, LP; Genesis Eldercare
Corporation; Genesis Eldercare Net-
work Services, Inc.; Genesis Eldercare
Management Services, Inc; Genesis Eld-
ercare Rehabilitation Services, Inc.;
Genesis Eldercare Staffing Services,
Inc.; Genesis Eldercare Physician Ser-
vices, Inc.; Genesis Eldercare Hospitali-
ty Services, Inc.; Horizon Associates,
Inc.; Horizon Mobile, Inc.; Horizon Re-
habilitation, Inc.; GMA Partnership

Holding Company, Inc.; GMA–Madison,
Inc.; GMA–Brightwood, Inc.; Helstat,
Inc.; Formation Capital, Inc.; FC–Gen
Acquisition, Inc.; Gen Acquisition Cor-
poration; and Jer Partners, LLC, Defen-
dants Below, Appellees.

Sharon A. Marchio, Executrix of the
Estate of Pauline Virginia
Willett, Plaintiff

v.

Clarksburg Nursing & Rehabilitation Cen-
ter, Inc., a West Virginia Corporation,
d/b/a Clarksburg Continuous Care Cen-
ter; Sheila K. Clark, Executive Director
of Clarksburg Nursing & Rehabilitation
Center, Inc., d/b/a Clarksburg Continu-
ous Care Center; John/Jane Doe # 1;
and Jennifer Mcwhorter, Defendants.

Nos. 35494, 35546, 35635.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 19, 2011.

Decided June 29, 2011.

**658**

James B. McHugh, Esq., Michael J. Fuller, Esq., D. Bryant Chaffin, Esq., McHugh Fuller Law Group, PLLC, Hattiesburg, MS, Harry G. Deitzler, Esq., Hill, Peterson, Carper, Bee & Deitzler, PLLC, Charleston, WV, Attorneys for Appellant Clayton Brown.

Andrew L. Paternostro, Esq., Jeff D. Stewart, Esq., The Bell Law Firm, PLLC, Charleston, WV, Attorneys for Appellee Jeffrey Taylor.

Frank E. Simmerman, Jr., Esq., Chad L. Taylor, Esq., Simmerman Law Office, PLLC, Clarksburg, WV, Attorneys for Plaintiff Sharon A. Marchio.

Christopher J. Regan, Esq., Bordas & Bordas, PLLC, Wheeling, WV, Attorney for Amicus Curiae West Virginia Association for Justice.

Shawn P. George, Esq., George & Lorensen PLLC, Charleston, WV, Attorney for Appellees Marmet Health Care Center, Inc., Canoe Hollow Properties, LLC, and Robin Sutphin.

Mark A. Robinson, Esq., Ryan Brown, Esq., Flaherty Sensabaugh Bonasso PLLC, Charleston, WV, Attorneys for Defendants Clarksburg Nursing & Rehabilitation Center, Inc., Sheila K. Clark, John/Jane Doe # 1, and Jennifer McWhorter.

Ancil G. Ramey, Esq., Steptoe & Johnson, PLLC, Charleston, WV, Attorney for Amicus Curiae West Virginia Health Care Association.

Elizabeth S. Lawton, Esq., Shuman, McCuskey & Slicer, PLLC, Charleston, WV, Marc James Ayers, Esq., Christopher C. Puri, Esq., Bradley Arant Boult Cummings LLP, Birmingham, AL, Attorneys for Amicus Curiae American Health Care Association.

KETCHUM, Justice:

In the three cases now before the Court, we are asked to examine two areas of the law which—surprisingly—we have never directly and comprehensively addressed.

The first area of the law we consider involves Section 2 of the Federal Arbitration Act ("the FAA").[1] We are asked to consider its preemptive effect on West Virginia's nursing home laws. These cases involve arbitration clauses buried within nursing home admission agreements. In each case, a plaintiff alleges that a nursing home negligently caused the death of a nursing home resident. In each case, a representative for the resident had signed an agreement, admitting the resident to the nursing home for treatment, which contained a clause stating that any disputes arising from negligent treatment by the nursing home would be submitted to arbitration. And in each case, the nursing

---

**1.** 9 U.S.C. §§ 1 to 16. The Federal Arbitration Act has, in the past, been referred to as the United States Arbitration Act.

home is arguing that any claims arising from the death of the resident must be dismissed from the circuit court and resolved by an arbitrator.

The basic argument of the parties centers on this: the plaintiffs argue that the arbitration clauses are prohibited by, and null and void under, Section 15(c) of West Virginia's Nursing Home Act.[2] The defendant nursing homes argue that Section 15(c) is preempted by Section 2 of the FAA.

As set forth below, after examining the Nursing Home Act, and setting forth the history and purposes of the FAA, we conclude that Section 15(c) is preempted by Section 2 of the FAA.

The second area of the law we are asked to examine concerns the common-law doctrine of unconscionability. While we have touched on this doctrine in many of our cases, we have never fully explained the principles and application behind unconscionability. As set forth below, after a comprehensive discussion of the doctrine of unconscionability, we conclude that, in two of the cases on appeal, the arbitration agreements at issue are unconscionable and unenforceable as a matter of law. In the third case, the issue of unconscionability was not considered by the trial court, but may be raised by the parties on remand.

Finally, after considering the history and purposes of the FAA, we determine that Congress did not intend for the FAA to apply to arbitration clauses in pre-injury contracts, where a personal injury or wrongful death occurred after the signing of the contract. In the context of pre-injury nursing home admission agreements, we do not believe that such arbitration clauses are enforceable to compel arbitration of a dispute concerning negligence that results in a personal injury or wrongful death.

I.

*Facts and Background*

Three cases have been consolidated before the Court for review. Two of the cases are

appeals of dismissal orders from the Circuit Court of Kanawha County; the third is a certified question from the Circuit Court of Harrison County.

The basic facts of each case are substantially the same. In each case, a person was ill or incapacitated and needed extensive, ongoing nursing care. The person was admitted to a nursing home, and a family member signed an admission agreement with the nursing home that contained an arbitration clause. The clause generally says that any disputes the ill or incapacitated person might have in the future with the nursing home would be submitted to arbitration.

Later, after the person died, a family member filed a lawsuit against the nursing home, alleging that various acts and omissions of the nursing home negligently caused injuries which eventually resulted in the ill or incapacitated person's death. In each case, the defendant nursing home sought an order from the circuit court dismissing the lawsuit and compelling the plaintiff family member to participate in binding arbitration.

The plaintiff family members all assert that they cannot be compelled to participate in arbitration, but rather have a right to have their claims heard by a jury in the circuit court. Among their many theories as to why the arbitration clauses are unenforceable, the plaintiffs argue that an arbitration contract in a nursing home admission agreement violates the West Virginia Nursing Home Act. The Act says that any written waiver by a nursing home resident of his or her right to commence a lawsuit for injuries sustained in a nursing home "shall be null and void as contrary to public policy." [3] In addition, two of the plaintiffs also allege that the arbitration clauses are unconscionable under the common law.

The nuances of each case are, however, somewhat different. We will therefore set forth the specific facts of each case.

**A. *Clarence Brown, No. 34494***

Clarence Brown was born with severe cerebral palsy and other disabling conditions, and was unable to care for himself. In 1996,

2. *W.Va.Code,* 16–5C–1 to –20.

3. *See W.Va.Code,* 16–5C–15(c) [1997].

at the age of 56, Clarence was admitted to Marmet Health Care Center, a long-term nursing home facility in Marmet, West Virginia. Shortly after his admission, a circuit court entered an order finding Clarence to be a "protected person," and appointing his brother, plaintiff Clayton T. Brown, as his legal guardian.[4]

Eight years later, on March 26, 2004, the nursing home had the plaintiff sign a new "Admissions Agreement" for Clarence. The plaintiff signed as the "Representative" and "Brother/Guardian" to Clarence.

On page 12 of the 13–page admission agreement is an arbitration clause that is at the center of this appeal.[5] The one paragraph arbitration clause provided among other things that "all disputes and disagreements" between Clarence and the nursing home, "including, without limitation, allegations ... of neglect, abuse or negligence," "shall be submitted to binding arbitration[.]" However, the clause preserved the nursing home's right to file a lawsuit in a circuit court to either collect money due from Clarence, or to have Clarence forcibly discharged from the nursing home.

The nursing home contends in its brief on appeal that it added the arbitration clause to the admission agreement in 2004 "because Marmet had lost its liability insurance coverage due to the well chronicled medical malpractice maelstrom of that time." The arbitration clause was introduced so the facility could "resolve any dispute by a less costly, quicker, less adversarial process," and the nursing home says that no potential resident of the home has ever refused to agree to arbitrate any claims.

During Clarence's residency at the nursing home, the plaintiff alleges that Clarence suffered pressure sores, dehydration, malnutrition, contractures, aspiration pneumonia, and infections. Clarence left the nursing home in May 2007. The plaintiff claims that as a result of the injuries sustained at the nursing home, Clarence died on June 10, 2008.

Plaintiff Clayton Brown filed the instant case against the numerous owners, operators and managers of Marmet Health Care Center, Inc. The plaintiff's complaint (and later amended complaint) alleged, among other things, that the defendants had been negligent and had failed to provide the level of care required by the West Virginia Nursing Home Act.[6] Shortly thereafter, the petitioner settled with most of the defendants, except for three: Marmet Health Care Center, Inc.; Canoe Hollow Properties, LLC ("Canoe Hollow"); and Robin Sutphin, the administrator of the facility.

On April 7, 2009, the three remaining defendants filed a motion to dismiss the plaintiff's claims pursuant to the arbitration clause in the Admission Agreement.

Plaintiff Brown argued before the circuit court that the arbitration clause was unenforceable, primarily because it violated Section 15(c) of the West Virginia Nursing Home Act. Section 15(c) creates a cause of action for violations of the Act's requirements, and prohibits waivers of the right to bring an action. The disputed portion of Section 15(c) says:

> Any waiver by a resident or his or her legal representative of the right to commence an action under this section, whether oral or in writing, shall be null and void as contrary to public policy.[7]

The parties have not discussed whether, under the circuit court's guardianship order and *W.Va. Code*, 44A–3–1, Clayton Brown had the authority to waive Clarence Brown's right to pursue an action against the nursing home in court in favor of an arbitration forum.

4. Clayton Brown was appointed guardian pursuant to the Guardianship and Conservatorship Act, *W.Va.Code*, 44A–1–1 to 44A–5–9. Under the Act, the guardian of a protected person is limited in power to only "obtaining provision for and making decisions with respect to the protected person's support, care, health, habilitation, education, therapeutic treatment, social interactions with friends and family, and ... to determine the protected person's residence." *W.Va.Code*, 44A–3–1(a) [2010]. The circuit court gave Clayton Brown the additional "authority to expend funds from the personal finance account of Clarence Gordon Brown with Marmet Health Care Center[.]"

5. The arbitration clause is attached, *infra*, as Appendix 1.

6. *W.Va.Code*, 16–5C–1 to –20.

7. *W.Va.Code*, 16–5C–15(c).

The plaintiff therefore argued that the nursing home's arbitration clause was null and void as contrary to public policy. The plaintiff also contended, under common law contract principles, that the clause was unconscionable, largely because it was a contract of adhesion that sought to prohibit the plaintiff from obtaining judicial relief yet allowed the defendant nursing home the right to go to court for nonpayment of fees, or to defend a decision to discharge a resident. The plaintiff also asked the circuit court to allow the parties to conduct discovery on factual matters relating to the enforceability of the arbitration clause.

In addition to the arbitration clause issues raised by all three defendants, defendant Canoe Hollow filed a motion to dismiss the plaintiff's claims on a different ground. Plaintiff Brown's suit against Canoe Hollow alleged that the company owned, operated, managed and/or controlled the nursing home facility during the time Clarence was a resident, and should therefore be directly liable for the actions of the nursing home's servants, agents and employees. Canoe Hollow argued in its motion to dismiss that it did not operate or control the operations of Marmet Health Care Center, but was merely a landlord that owned the building and property on which the nursing home was operated. Canoe Hollow presented the circuit court with a written lease, dated January 31, 2003, which *stated* that the relationship of the parties was solely one of landlord and tenant, and *stated* that Canoe Hollow had no ownership interest in the nursing home. The circuit court granted Canoe Hollow's motion to dismiss in an order dated May 15, 2009. The circuit court's order does not specify the reasons for the dismissal other than "the Motion, Briefs, record and argument of counsel."

Subsequently, in an order dated August 25, 2009, the circuit court dismissed the plaintiff's action against Marmet Health Care Center, Inc., and Robin Sutphin. The circuit court concluded that the plaintiff was re-

quired to arbitrate all of his claims against these two defendants.

Plaintiff Clayton Brown now appeals the circuit court's May 15, 2009 order dismissing his claims against Canoe Hollow, and appeals the circuit court's August 25, 2009 order dismissing the remaining defendants (Marmet Health Care Center, Inc., and Robin Sutphin) and compelling his claims against those defendants to be arbitrated.

### B. Leo Taylor, No. 35546

On February 8, 2006, 86–year–old Leo Taylor was admitted to the Marmet Health Care Center by his elderly wife, Ellen Taylor.[8] Mr. Taylor suffered from advanced dementia and Alzheimer's disease, and could not care for himself. Marmet Health Care Center provides specialized care for patients with dementia and Alzheimer's disease.

At the time of Mr. Taylor's admission, Mrs. Taylor signed a 13–page "Admissions Agreement" that contained an arbitration clause. The arbitration clause was identical to the previously mentioned arbitration clause in Clarence Brown's admission agreement.[9]

On December 27, 2006, Mr. Taylor was taken to the hospital with an infection. He died from the infection on January 14, 2007. Mrs. Taylor died sometime thereafter.

On January 23, 2009, plaintiff Jeffrey Taylor (Leo Taylor's son), as the personal representative of Leo Taylor's estate, filed a wrongful death action[10] and a negligence action under the West Virginia Nursing Home Act against the various owners, operators, and employees of Marmet Health Care Center. The plaintiff alleged that the acts and omissions of the nursing home had caused Leo Taylor to fall several times, and caused him to have pressure ulcers, dehydration and other injuries that contributed to his death.

The nursing home filed a motion to dismiss the plaintiff's lawsuit which said that Leo

---

**8.** Mrs. Taylor also had physical ailments, and shortly thereafter was herself admitted to Marmet Health Care Center.

**9.** The arbitration clause is attached, *infra,* as Appendix 1.

**10.** *See W.Va.Code,* 55–7–5 to –8 (actions for wrongful death).

Taylor had "agreed to be subject to the terms and conditions" of the nursing home's admission agreement. The nursing home's motion stated that under the admission agreement signed by Mrs. Taylor, any claim that Leo Taylor has or had against the nursing home "is subject to binding, final arbitration." The nursing home therefore asked the circuit court to dismiss the plaintiff's lawsuit.

Plaintiff Taylor contended before the circuit court that the arbitration clause was not enforceable. The plaintiff argued, among other things, that the clause violated the Nursing Home Act's aforementioned prohibition against waivers of the right to commence an action. The plaintiff also argued that the arbitration clause was a contract of adhesion, written in "take-it-or-leave-it" language, that required the plaintiff to pay excessive fees to file an arbitration claim while preserving the defendants' right to file a less-expensive action in circuit court. Additionally, the plaintiff contended that there was no evidence that Mrs. Taylor had any authority to waive Mr. Taylor's rights—or the rights of his wrongful death beneficiaries—to pursue an action in court.

In a detailed order entered September 29, 2009, the circuit court granted the defendant nursing home's motion and dismissed the plaintiff's lawsuit. The circuit court concluded that under the admission agreement, the plaintiff is required to arbitrate all of the claims asserted against the nursing home.

Plaintiff Jeffrey Taylor, as administrator of his father's estate, now appeals the circuit court's September 29, 2009 dismissal order.

### C. Pauline Virginia Willett, No. 35635

In early 2006, 94–year–old Pauline Virginia Willett lived with her daughter, plaintiff Sharon A. Marchio. Ms. Willett suffered from numerous ailments including Alzheimer's disease, ischemic cardiomyopathy, hypertension, chronic obstructive pulmonary disease, asthma, osteoarthritis, and osteoporosis.

On May 21, 2006, Ms. Willett was admitted to a hospital for treatment of several illness-

es. Plaintiff Marchio was also having her own significant health problems, and believed that in the short term she could no longer properly care for her mother. The plaintiff therefore decided that, upon Ms. Willett's discharge from the hospital, Ms. Willett should be temporarily admitted to a nursing home while the plaintiff tended to her own health concerns.

On May 25, 2006, plaintiff Marchio visited the office of Clarksburg Continuous Care Center, a nearby skilled nursing, rehabilitation and long-term care facility. On behalf of Ms. Willett, the plaintiff signed a 73–page admission agreement on a line marked "Resident/Representative." Included as part of the agreement, on pages 35 and 36, was an arbitration clause entitled "Resident and Facility Arbitration Agreement." [11]

The arbitration clause specifies that "any legal dispute" or claim of "violations of any right granted ... by law" Ms. Willett might have regarding "health care provided" by the nursing home would have to be resolved "exclusively by binding arbitration ... and not by a lawsuit or resort to court process[.]" The arbitration clause also says, in all capital letters, "THE PARTIES UNDERSTAND AND AGREE THAT BY ENTERING THIS ARBITRATION AGREEMENT THEY ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY." The arbitration clause says it applies to Ms. Willett, and to her "successors and assigns" including her "child, guardian, executor, administrator, legal representative or heir."

Two days later, on May 27, 2006, Ms. Willett was discharged from the hospital and transferred to Clarksburg Continuous Care Center. The plaintiff alleges that over the next five weeks, Ms. Willett lost weight, had severe urinary tract and other infections, and became withdrawn and lethargic. On July 3, 2006, family members insisted that Ms. Willett be transferred to a hospital, where she was found to be dehydrated, suffering from pneumonia, septicemia, an acute myocardial

---

**11.** The "Resident and Facility Arbitration Agreement" is attached at the end of this opinion as

Appendix 2.

infarction, renal failure, and congestive heart failure. Ms. Willett died on July 6, 2006.

Plaintiff Marchio was appointed the administratrix of her mother's estate. On July 2, 2008, the plaintiff filed the instant case against the owner, executive director, and other employees of Clarksburg Continuous Care Center. The plaintiff's complaint alleges that the defendants were negligent in failing to meet their obligations under the West Virginia Nursing Home Act, and thereby caused or contributed to Ms. Willett's injuries and death.

On July 24, 2008, the defendants filed a motion to dismiss the plaintiff's complaint and, under the terms of the admission agreement, to compel arbitration of the plaintiff's claims pursuant to the Federal Arbitration Act.

The plaintiff responded that the arbitration clause in the agreement was unenforceable. The sole argument made by the plaintiff was that the clause was "null and void as contrary to public policy" under the aforementioned Section 15(c) of the Nursing Home Act.

The circuit court declined to rule on the defendants' motion to dismiss. Instead, in an order dated February 24, 2010, the circuit court certified the following question to this Court regarding the enforceability of the arbitration clause:

Is West Virginia Code § 16–5C–15(c), which provides in pertinent part that "[a]ny waiver by a resident or his or her representative of the right to commence an action under this section, whether oral or in writing, shall be null and void as contrary to public policy," preempted by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, when a nursing home resident's representative has executed an arbitration agreement as part of the nursing home's admission documents and the arbitration

agreement contains the following terms and conditions:

a. the arbitration agreement applies to and binds both parties by its terms;

b. the arbitration agreement contains language in upper case typescript stating as follows: "THE PARTIES UNDERSTAND AND AGREE THAT BY ENTERING THIS ARBITRATION AGREEMENT THEY ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN [A] COURT OF LAW BEFORE A JUDGE AND A JURY."; and

c. the resident's representative is specifically advised that she has the right to seek legal counsel concerning the arbitration agreement, the execution of the arbitration agreement is not a pre-condition to admission to the nursing home facility, and the arbitration agreement may be rescinded by the resident through written notice to the facility within thirty (30) days of signing the arbitration agreement.

The circuit court answered the certified question "Yes," and ruled that the Federal Arbitration Act preempts the West Virginia Nursing Home Act, *W.Va.Code*, 16–5C–15(c), "insofar as the [Nursing Home Act] would require judicial consideration of claims brought under the [Act] and would lodge primary jurisdiction to hear cases under the [Act] in the Circuit Courts of West Virginia."

On June 2, 2010, this Court granted the parties' petition to review the certified question from the circuit court.

## II.

### Standard of Review

We review the questions raised by circuit courts' dismissal and certified question orders *de novo*.[12] As we said in Syllabus

---

**12.** *See* Syllabus Point 2, *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 461 S.E.2d 516 (1995) ("Appellate review of a circuit court's order granting a motion to dismiss a complaint is *de novo.*"); Syllabus Point 1, *Gallapoo v. Wal–Mart Stores, Inc.*, 197 W.Va. 172, 475 S.E.2d 172 (1996) ("The appellate standard of review of questions of law answered and

certified by a circuit court is *de novo.*"); Syllabus Point 1, *Appalachian Power Co. v. State Tax Dept. of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995) ("Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review."); Syllabus Point 1, *Morgan v. Ford Motor Co.*, 224 W.Va. 62, 680 S.E.2d 77 (2009) ("Preemption is a question

Point 4 of *McGraw v. American Tobacco Company*, 224 W.Va. 211, 681 S.E.2d 96 (2009):

> This Court will preclude enforcement of a circuit court's order compelling arbitration only after a de novo review of the circuit court's legal determinations leads to the inescapable conclusion that the circuit court clearly erred, as a matter of law, in directing that a matter be arbitrated or that the circuit court's order constitutes a clear-cut, legal error plainly in contravention of a clear statutory, constitutional, or common law mandate.

## III.

### Discussion of the Law

### A.

### Problems Underlying the Nursing Home Admission Agreement Process

The process of signing paperwork for medical care—specifically, a contract for admission to a nursing home—is often fraught with urgency, confusion, and stress. People seek medical care in a nursing home for long-term treatment to heal; they rarely view the admission process as an interstate commercial transaction with far-reaching legal consequences.

A widely held misconception is that nursing homes are merely places for the elderly to live. In reality, a nursing home is much more than a residential facility. A nursing home provides continuous care for people of all ages "who are ill or otherwise incapacitated and in need of extensive, ongoing nursing care due to physical or mental impairment," and rehabilitation care for people "convalescing from illness or incapacitation." [13]

Because of illness, incapacitation, or physical or mental impairment, people being admitted to a nursing home are usually quite vulnerable. For many people, the initial acceptance of the need for institutionalization is difficult and stress-inducing. This is particularly the case for older adults, because it underscores their dependency and signals the end of their freedom to make many personal choices. Furthermore, the decision to be admitted to a nursing home, and the choice of a nursing home, often is made in the midst of a crisis brought on by a precipitous deterioration in the person's health. The decision is also often impelled by the loss of, or deterioration in the health of, a spouse or care giver,[14] or when their care-giving family is no longer able to adequately manage the demands of home care.[15]

A person's admission to a nursing home often follows a period of acute hospitalization.[16] Many of these admissions occur directly from a hospital's discharge planning process. The hospital, and not the person or the person's family, contacts area nursing homes to determine which nursing home facility has the skills, equipment, and/or space to admit the person.[17] Greater consideration is often given to nursing home facilities in close proximity to the person's home or person's family. In the process, the hospital and nursing home discuss the person's medical

---

of law reviewed *de novo*."); *State ex rel. Saylor v. Wilkes*, 216 W.Va. 766, 772, 613 S.E.2d 914, 920 (2005) ("[O]ur review of whether Petitioner's [Arbitration] Agreement represents a valid and enforceable contract is de novo.").

**13.** *W.Va.Code*, 16–5C–2(e) [1997].

**14.** *See, e.g., Podolsky v. First Healthcare Corp.*, 50 Cal.App.4th 632, 652, 58 Cal.Rptr.2d 89, 101 (1996) (*citing* Donna Ambrogi, "Legal Issues in Nursing Home Admissions," 18 Law Med. & Health Care 254, 258 (1990)).

**15.** Maureen Armour, "A Nursing Home's Good Faith Duty 'to' Care: Redefining A Fragile Relationship Using the Law of Contract," 39 St. Louis L.J. 217, 222 (1994) (noting that "for many families and elders, long-term institutionalized care in a nursing facility is the only alternative available when personal caregiving needs exceed a family's ability to provide care."); Marshall B. Kapp, "The 'Voluntary' Status of Nursing Facility Admissions: Legal, Practical, and Public Policy Implications," 24 New Eng. J. on Crim. & Civ. Confinement 1, 2 (1998) (stating that an older person's move to a nursing home often follows a period of acute hospitalization when she and/or her family cannot manage the demands of home care).

**16.** Marshall B. Kapp, "The 'Voluntary' Status of Nursing Facility Admissions: Legal, Practical, and Public Policy Implications," 24 N. E. J. on Crim. & Civ. Con. at 3.

**17.** *Id.* at 2.

condition and—in essence—initiate the process of admission to the nursing home without input or knowledge from the person or the person's family. Medical records are transferred and arrangements are made to smooth the person's transfer to the nursing home, so that when the person arrives there is nothing more to be done than signing the nursing home's forms. While this behind-the-scenes process takes much stress off of the person, it might also discourage the person (or person's family) from questioning the content of the forms to be signed, because of the implicit perception that the forms must be signed as a condition of admission.

Moreover, in the 1980s, the government changed the way hospitals were paid for their Medicare patients; since the change, discharge planning occurs "quicker and sicker." [18] The weakened physical and emotional condition of a person from an acute illness is one of the most significant factors that compels a decision to seek post-hospital nursing home placement. Compounding the dangers of this decision-making time, not only is the person being discharged "quicker and sicker," but the hospital treatment itself often further debilitates the person. A person's "decision" to enter a nursing home is, therefore, often made when the person's decision-making abilities are seriously impaired.

Unlike the situation that exists when a consumer signs a contract for a product or service, people entering a nursing home have to sign admissions contracts in the midst of a crisis, without time to comparison shop or to negotiate the best service and price combination. Put simply, there is usually little time to investigate options or to wait for an opening at a nursing home of choice.[19] Time pressure during the hospital discharge process significantly impairs people's ability to seek and carefully consider alternatives. Potential residents and their family members often experience panic when they feel there is insufficient time to consider different facilities, and they may choose a facility they would not have chosen if they had more time to weigh their options.[20]

Further, many nursing home facilities lack a coherent admissions process, adding to the chaos and stress surrounding the admission of a resident.[21] The form and actual process of signing an admissions contract compromises the ability of potential residents and their families to make informed decisions. "[I]n many, if not most cases, there is no clear admission procedure.... Rather, the time of admission is very likely to be full of confusion and stress for all involved, and the residents (or more likely, their representative or family member) commonly sign all the documents without knowing or understanding what they are signing." [22] In the typical nursing home admission process, residents and their family members do not have time to read and deliberate on the terms of the agreement.[23] Facilities often present the contract *after* the person decides to apply for admission, rather than beforehand, when the individual or his or her representative can carefully examine the admission contract, and contemplate the meaning and ramifications of its provisions, particularly those that have nothing to do with care and related services and costs.[24] Furthermore, there is

---

**18.** Linda S. Whitton, "Navigating the Hazards of the Eldercare Continuum," 6 J. Mental Health and Aging 145, 150 (2000).

**19.** *See,* Denese Vlosky, *et al.,* " 'Say–So' as a Predictor of Nursing Home Readiness," 93 J. of Family & Consumer Science 59 (2001).

**20.** Linda S. Whitton, "Navigating the Hazards of the Eldercare Continuum," 6 J. Mental Health and Aging at 150.

**21.** Donna Ambrogi & Frances Leonard, "The Impact of Nursing Home Admission Agreements on Resident Autonomy," 28 The Gerontologist 82, 83–88 (1988).

**22.** *Id.* at 83.

**23.** *Id.*

**24.** *See, e.g.,* Ann E. Krasuski, "Mandatory Arbitration Agreements Do Not Belong in Nursing Home Contracts with Residents," 8 DePaul J. Health Care L. 263, 280 (2004) (stating that "[a]dmitting a loved one to a nursing home is an overwhelming and stressful undertaking for families.... If families give any thought to the admissions agreement they are signing, they probably do not consider whether it contains a mandatory arbitration agreement."); California Advocates for Nursing Home Reform, "Better Read the Small Print! An Analysis of Admission Agreements in California's Residential Care Facilities for the Elderly," 1 (March 2003).

often no time for the person to sit down with a facility representative who can answer questions and explain the contract's terms.[25] As we discuss later, admissions agreements typically are pre-printed contracts of adhesion offered on a take-it-or-leave-it basis, giving residents no meaningful opportunity to change or negotiate the terms.[26]

Ultimately, people being admitted to long-term care facilities and their families have to sign admission contracts without time to comparison shop or "to negotiate the best service and price combination. The pressures of deciding placement at such a time, coupled with physical and/or mental infirmities, facing discharge from the hospital, financial limitations, and/or lack of knowledge about long-term care options make consumers vulnerable and dependent on full disclosure by facilities."[27] In such an environment, it is common that residents or their family members rarely know that the admission contract contains provisions that go far beyond the medical care and other services the facility promises (or is expected) to provide and that, instead, have serious implications for their legal and constitutional rights.

## B.

### *The Constitutional Right to a Trial*

The admission agreements in this case contain arbitration clauses that eliminate a fundamental constitutional right: the right of the parties to have a jury trial in the West Virginia circuit court system on the plaintiffs' personal injury claims against the defendant nursing homes.

■ Put simply, the parties have a fundamental constitutional right to use West Virginia's court system to seek justice.[28] The *West Virginia Constitution*, Article III, § 17 protects the right of the people to open access to the courts to seek justice, and states:

> The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay.

And Article III, § 13 of the *Constitution*, which preserves the right of the people to a jury trial over any controversy, states:

> In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved; and in such suit in a court of limited jurisdiction a jury shall consist of six persons. No fact tried by a jury shall be otherwise reexamined in any case than according to rule of court or law.

These constitutional protections were adopted to ensure impartial and open enforcement of our civil and criminal laws. Justice Starcher, writing for the Court, eloquently identified the founders' motivations for these constitutional provisions:

> These constitutional rights—of open access to the courts to seek justice, and to trial by jury—are fundamental in the State of West Virginia. Our constitutional founders wanted the determinations of what is legally correct and just in our society, and the enforcement of our criminal and civil laws to occur in a system of open, accountable, affordable, publicly supported, and impartial tribunals—tribunals

**25.** Donna Ambrogi & Frances Leonard, "The Impact of Nursing Home Admission Agreements on Resident Autonomy," 28 The Gerontologist at 83.

**26.** *See, e.g.,* Rebecca J. Benson, Gerontology Inst., "Check Your Rights at the Door, Consumer Protection Violations in Massachusetts Nursing Home Admission Agreements," 4 (1997); California Advocates for Nursing Home Reform, "Better Read the Small Print! An Analysis of Admission Agreements in California's Residential Care Facilities for the Elderly," 2 (March 2003); Charles P. Sabatino, "Nursing Home Admission Contracts: Undermining Rights the Old Fashioned Way," 24 Clearinghouse Rev. 553, 555

(1990); Patricia Nemore, "Illegal Terms in Nursing Home Admission Contracts," 18 Clearinghouse Rev. 1165 (1985).

**27.** California Advocates for Nursing Home Reform, "Better Read the Small Print! An Analysis of Admission Agreements in California's Residential Care Facilities for the Elderly," 2 (March 2003).

**28.** *See also,* Rule 38(a) of the *Rules of Civil Procedure* ("The right of trial by jury as declared by the Constitution or statutes of the State shall be preserved to the parties inviolate.").

that involve, in the case of the jury, members of the general citizenry. These fundamental rights do not exist just for the benefit of individuals who have disputes, but *for the benefit of all of us.* The constitutional rights to open courts and jury trial serve to sustain the existence of a core social institution and mechanism upon which, it may be said without undue grandiosity, our way of life itself depends.[29]

■ The West Virginia Bill of Rights begins, in Article III, § 1 of the *Constitution,* with the statement that the *Constitution* protects "certain inherent rights" which people "cannot, by any compact, deprive or divest their posterity." Still, we have recognized that the constitutionally-enshrined and fundamental rights to assert one's claims for justice before a jury in the public court system may be the subject of a legally enforceable waiver.[30] However, "Courts indulge every reasonable presumption against waiver of a fundamental constitutional right and will not presume acquiescence in the loss of such fundamental right." [31]

■ In essence, our *Constitution* recognizes that factual disputes should be decided by juries of lay citizens rather than paid, professional fact-finders (arbitrators) who may be more interested in their fees than the disputes at hand.

## C.

### Arguments of the Parties

It is in this context—the stress induced by the nursing home admission process, combined with the fundamental constitutional rights that the defendants assert have been waived in the admission agreements—that we examine the arguments of the parties. The briefs and arguments of the parties, and the question certified from the circuit court, present three common issues that require examination by this Court.

First, we are asked to consider the effect of the Nursing Home Act upon arbitration clauses in nursing home admission agreements. Section 15(c) of the Act explicitly prohibits "any waiver by a resident or his or her legal representative of the right to commence an action" under the Act, declaring that such waivers are "null and void as contrary to public policy." [32] The plaintiffs assert that the arbitration clauses at issue are nothing more than a written contractual requirement that a nursing home resident (or his or her legal representative) waive the resident's right to commence an action in circuit court, and therefore under Section 15(c) of the Nursing Home Act are null and void as contrary to public policy.

Second, we are asked to examine the Federal Arbitration Act ("the FAA"), and consider its impact on the operation of Section 15(c) of the Nursing Home Act. The defendant nursing homes assert that Section 2 of the FAA [33] preempts the state statute. Section 2 of the FAA explicitly makes written arbitration agreements in transactions involving interstate commerce "valid, irrevocable, and enforceable." The nursing homes argue that their admission agreements affect interstate

---

**29.** *State ex rel. Dunlap v. Berger,* 211 W.Va. 549, 560, 567 S.E.2d 265, 276 (2002).

**30.** *See, e.g., Stephenson v. Ashburn,* 137 W.Va. 141, 144, 70 S.E.2d 585, 587 (1952) ("Of course a trial by jury may be waived, but the waiver must appear of record.").

**31.** Syllabus Point 2, *State ex rel. May v. Boles,* 149 W.Va. 155, 139 S.E.2d 177 (1964). *See also, Norfolk and Western R. Co. v. Sharp,* 183 W.Va. 283, 285, 395 S.E.2d 527, 527 (1990) ("[A]s with all basic constitutional rights, any waiver must be based on an informed and knowing decision.").

We held in *Woodruff v. Board of Trustees of Cabell Huntington Hospital,* 173 W.Va. 604, 611, 319 S.E.2d 372, 379 (1984), that Article III of the

*West Virginia Constitution* contains "inherent rights, of which members of society may not by contract divest themselves," and that our *Constitution* is "more stringent in its limitation on waiver [of fundamental constitutional rights] than is the federal constitution." However, we have only found the freedoms of speech and press under Article III, § 7, and the rights to assemble, associate, and petition under Article III, § 16, to be such "inherent rights." The parties have not argued, and we do not decide, whether the rights to trial by jury under Article III, § 13 and to open access to the courts under Article III, § 17 are inherent rights that members of society may not by contract divest themselves.

**32.** *W.Va.Code,* 16–5C–15(c) [1997].

**33.** 9 U.S.C. § 2 [1947].

commerce and, therefore, pursuant to the FAA, the circuit courts are required to find the arbitration clauses in those agreements are valid, irrevocable, and enforceable, regardless of Section 15(c) of the Nursing Home Act.

Third, we are asked to examine the doctrine of unconscionability. The plaintiffs point out that the second half of Section 2 of the FAA contains a "saving clause." The saving clause states that, despite the mandatory sense of the first part of the statute, an arbitration agreement may still be declared invalid, revocable and unenforceable "upon such grounds as exist at law or in equity for the revocation of any contract." [34] The plaintiffs argue that the arbitration clauses at issue are unenforceable upon a ground that exists in equity: the doctrine of unconscionability. The plaintiffs assert that, at a minimum, they should be permitted discovery before the circuit court to develop evidence on whether an arbitration clause is unenforceable because of unconscionability, or upon some other grounds that exist at law or in equity.

Separate from the three issues common to all three consolidated cases, we will last address the circuit court's order dismissing plaintiff Clayton Brown's lawsuit against Canoe Hollow Properties on the ground that it was, ostensibly, only the owner of the building where Marmet Health Care Center operated a nursing home.

### (1) The Nursing Home Act

The West Virginia Nursing Home Act was created to allow people who are convalescing, or whose physical or mental condition requires them to receive ongoing medical care, to have care and treatment in facilities that, "to the extent practicable, will approximate a normal home environment." [35] The Act was designed to promote and require that nursing homes be maintained and operated "so as to ensure protection of the rights and dignity of those using the services of such facilities." [36] To achieve this end, the Legislature declared that the provisions of the Act are remedial and "shall be liberally construed." [37]

The Nursing Home Act empowers the Secretary of the West Virginia Department of Health and Human Services to inspect and license nursing homes, and to investigate violations of the Act.[38] The Act also authorizes the Secretary to craft rules setting minimum standards for operating nursing homes, such as the minimum number and qualifications of personnel, safety standards, sanitation requirements, and record-keeping requirements.[39] The Secretary is permitted to bring a legal action to enforce compliance with the Act.[40] The Act creates criminal penalties for operating a nursing home without a license, and for interfering with the Secretary's enforcement of the Act.[41]

The Nursing Home Act also creates a civil cause of action for injuries caused to a nursing home resident. Section 15(c) of the Act states, in part:

Any nursing home that deprives a resident of any right or benefit created or established for the well-being of this resident by the terms of any contract, by any state statute or rule, or by any applicable federal statute or regulation, shall be liable to the resident for injuries suffered as a result of such deprivation. Upon a finding that a resident has been deprived of such a right or benefit, and that the resident has been injured as a result of such deprivation, and unless there is a finding that the nursing home exercised all care reasonably necessary to prevent and limit the deprivation and injury to the resident, compensatory damages shall be assessed in an amount sufficient to compensate the resident for such injury. In addition, where the deprivation of any such right or benefit is found to have been willful or in reckless disregard of the lawful rights of the resi-

34. *Id.*

35. *W.Va.Code,* 16–5C–1 [1997].

36. *Id.*

37. *Id.*

38. *W.Va.Code,* 16–5C–3 [1997].

39. *W.Va.Code,* 16–5C–5 [2005].

40. *W.Va.Code,* 16–5C–15(b).

41. *W.Va.Code,* 16–5C–15(a).

dent, punitive damages may be assessed. A resident may also maintain an action pursuant to this section for any other type of relief, including injunctive and declaratory relief, permitted by law. Exhaustion of any available administrative remedies may not be required prior to commencement of suit hereunder.[42]

The Nursing Home Act says that the penalties and remedies under the Act "are cumulative and shall be in addition to all other penalties and remedies provided by law."[43]

The instant case centers upon one sentence in Section 15(c) of the Nursing Home Act, which states:

Any waiver by a resident or his or her legal representative of the right to commence an action under this section, whether oral or in writing, shall be null and void as contrary to public policy.[44]

Under this sentence in Section 15(c), the plaintiffs contend that the disputed arbitration clauses in the admission agreements (which say that a nursing home resident waives the right to commence a civil action in circuit court and instead must commence an arbitration proceeding) are null and void as contrary to public policy. However, the defendant nursing homes counter that Section 15(c) of the Nursing Home Act is preempted by Section 2 of the Federal Arbitration Act ("the FAA"), and cannot be applied to void a written arbitration clause that involves interstate commerce in a nursing home admission agreement. To discern whether Section 15(c) of the Nursing Home Act is preempted by Section 2 of the FAA requires that we outline our law of preemption, outline the jurisprudence interpreting Section 2 of the FAA, and assess whether Section 15(c) stands as an obstacle to the purpose and effect of Section 2.

### (2) Preemption and the Federal Arbitration Act

 The preemption doctrine has its foundation in the Supremacy Clause of the United States Constitution, and "invalidates state laws that interfere with or are contrary to federal law."[45] A state law is preempted if Congress's command either is expressly stated in the federal statute's language, or is implicitly contained in the statute's structure and purpose.[46] Express preemption occurs when Congress has specifically and plainly stated its intent to occupy a given field, and in such cases any state law falling within that field will be completely preempted.[47] Implied preemption occurs in two ways. "Implied field preemption occurs where the scheme of federal regulation is so pervasive that it is reasonable to infer that Congress left no room for the states to supplement it. Implied conflict preemption occurs where compliance with both federal and state regulations is physically impossible, or where the state regulation is an obstacle to the accomplishment or execution of congressional objectives."[48]

 The preemptive powers of the FAA are found in Section 2, the "primary substantive provision of the Act."[49] The provision contains two parts: the first part holds that written arbitration agreements affecting in-

---

**42.** *W.Va.Code,* 16–5C–15(c).

**43.** *W.Va.Code,* 16–5C–15(d).

**44.** *W.Va.Code,* 16–5C–15(c). The corollary regulation in the *Code of State Rules* says:

Residents, residents' families or legal representatives, and ombudsmen may also independently pursue violations of this rule in court. Any waiver by a resident or his or her legal representative of the right to commence an action under W. Va.Code § 16–5C–15, whether oral or in writing, is void as contrary to public policy.

W.V.C.S.R. § 64–13–16.9.d.7 [2007].

**45.** Syllabus Point 1, *Cutright v. Metropolitan Life Ins. Co.,* 201 W.Va. 50, 491 S.E.2d 308 (1997).

**46.** Syllabus Point 4, *Morgan v. Ford Motor Co.,* 224 W.Va. 62, 680 S.E.2d 77 (2009).

**47.** *See,* Syllabus Point 6, *Morgan v. Ford Motor Co.,* 224 W.Va. 62, 680 S.E.2d 77 (2009) ("To establish a case of express preemption requires proof that Congress, through specific and plain language, acted within constitutional limits and explicitly intended to preempt the specific field covered by state law.").

**48.** Syllabus Point 7, *Morgan v. Ford Motor Co.,* 224 W.Va. 62, 680 S.E.2d 77 (2009).

**49.** *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

terstate commerce [50] are "valid, irrevocable, and enforceable," [51] but the second part is a "savings clause" that allows courts to invalidate those arbitration agreements using general contract principles. The relevant portion of Section 2 states:

A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. [52]

Nowhere in the FAA did Congress include an express preemption provision, and the United States Supreme Court has determined that the FAA does not imply a congressional intent to occupy the entire field of arbitration. [53] Instead, under Section 2 of the FAA, only implied conflict preemption is at issue. Thus, we must consider whether the FAA actually, and to what extent, conflicts with the Nursing Home Act. The Nursing Home Act is preempted by the FAA to the extent that it conflicts with and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." [54]

To understand the full purposes and objectives of Congress in enacting the FAA, we must delve into the history behind its adoption. As two of the drafters of the FAA said in a 1926 article, the FAA "must be read in light of the situation which it was devised to correct and of the history of arbitration[.]" [55]

Historically, in the late 1800s and early 1900s, most American state and federal courts were hostile to arbitration clauses in contracts and determined that they were, under various common law theories, unen-

---

**50.** The United States Supreme Court has interpreted the term "involving commerce" in Section 2 to be the "functional equivalent of the ... term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) (internal citations omitted). Hence, the FAA will reach transactions "in individual cases without showing any specific effect upon interstate commerce *if in the* aggregate the economic activity in question would represent a general practice subject to federal control." 539 U.S. at 56–57, 123 S.Ct. 2037 (citations omitted).

**51.** In Syllabus Point 1 of *Copley v. NCR Corporation*, 183 W.Va. 152, 394 S.E.2d 751 (1990), we interpreted this part of Section 2 to mean that "[t]he United States Arbitration Act ... provides for mandatory enforcement of arbitration clauses in contracts involving a maritime or interstate transaction." We went on in *Copley* to conclude that employment contracts of workers engaged in interstate commerce were not affected by the FAA, and that such workers had a right to pursue a human rights action in state court. We note, however, that much of our holding in *Copley* conflicts with a later U.S. Supreme Court interpretation of the FAA. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 506 (4th Cir.2002) ("Whatever force *Copley* may formerly have had, its ruling on arbitration cannot trump ... *Circuit City v. Adams*. The Supremacy Clause precludes any argument to the contrary.").

**52.** 9 U.S.C. § 2.

The West Virginia common-law corollary to Section 2 may be found in the seminal case of *Board of Ed. of Berkeley County v. W. Harley Miller, Inc.*, 160 W.Va. 473, 236 S.E.2d 439 (1977). We stated, in Syllabus Point 3, that "[i]t is presumed that an arbitration provision in a written contract was bargained for and that arbitration was intended to be the exclusive means of resolving disputes arising under the contract[.]" However, we went on to say that a party to an arbitration agreement could still contend that "the arbitration provision was unconscionable, or was thrust upon him because he was unwary and taken advantage of, or that the contract was one of adhesion[.]" *Id.* A trial court would then be required to assess whether the arbitration provision was "bargained for and valid" by examining "the entire contract, the nature of the contracting parties, and the nature of the undertakings covered by the contract." *Id.*

**53.** *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 477, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

**54.** *Volt Information Sciences*, 489 U.S. at 477, 109 S.Ct. 1248, *quoting Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

**55.** Julius H. Cohen & Kenneth Dayton, "The New Federal Arbitration Law," 12 Va.L.Rev. 265, 266 (1926).

forceable. This Court was no different. For instance, in 1894 this Court ruled that:

> A provision in a contract that all differences arising under it shall be submitted to arbitrators ... will not prevent a party from maintaining a suit, in the first instance, in a court to enforce his rights under it.[56]

We routinely held in our cases that "[a]t common law an agreement to submit to arbitration was revocable at any time before [an] award.... A contract to submit future differences to arbitration is not binding."[57]

▮ In 1925, the FAA was enacted and signed into law. "When Congress enacted the FAA, its purpose was twofold: to reverse the longstanding judicial hostility toward arbitration agreements and to place arbitration agreements on equal footing with other contracts."[58] The United States Supreme Court has therefore repeatedly concluded that the goal of Section 2 of the FAA is for an arbitration agreement to be treated by courts like any other contract, nothing more, and nothing less. The FAA has no talismanic effect; it does not elevate arbitration clauses to a level of importance above all other contract terms. "There is no federal policy favoring arbitration under a certain set of procedural rules; the federal policy is simply to ensure the enforceability, according to their terms, of private agreements to arbitrate."[59] It is a "fundamental principle that arbitration is a matter of contract,"[60] and "[t]he FAA ... places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms."[61] Put simply, the "purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so."[62]

▮ "When state law prohibits outright the arbitration of a particular type of claim, the [preemption] analysis is straightforward: The conflicting rule is displaced by

---

**56.** Syllabus Point 1, *Kinney v. Baltimore & Ohio Employes' Relief Assoc.*, 35 W.Va. 385, 14 S.E. 8 (1891).

**57.** *Hughes v. National Fuel Co.*, 121 W.Va. 392, 396–97, 3 S.E.2d 621, 624 (1939). Cases like *Hughes* and *Kinney, supra,* have been displaced by our subsequent rulings on the common law of arbitration agreements. *See, e.g.,* Syllabus Point 1, *Board of Education v. W. Harley Miller, Inc.,* 160 W.Va. 473, 236 S.E.2d 439 (1977) ("Where parties to a contract agree to arbitrate either all disputes, or particular limited disputes arising under the contract, and where the parties bargained for the arbitration provision, such provision is binding, and specifically enforceable ...").

**58.** Ann E. Krasuski, "Mandatory Arbitration Agreements Do Not Belong in Nursing Home Contracts with Residents," 8 DePaul J. Health Care L. 263 (2004). *See also, Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. 265, 270–71, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995) ("First, the basic purpose of the Federal Arbitration Act is to overcome courts' refusals to enforce agreements to arbitrate.... It intended courts to enforce [arbitration] agreements into which parties had entered, and to place such agreements upon the same footing as other contracts[.]"); *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (the FAA was adopted "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts."); Julius H. Cohen & Kenneth

Dayton, "The New Federal Arbitration Law," 12 Va.L.Rev. 265 (1926) ("By this Act there is reversed the hoary doctrine that agreements for arbitration are reversible at will and are unenforceable, and in the language of the statute itself, they are made 'valid, enforceable and irrevocable' within the limits of Federal jurisdiction.")

**59.** *Volt Information Sciences,* 489 U.S. at 476, 109 S.Ct. 1248. The overriding goal of the FAA was not "to promote the expeditious resolution of claims;" rather, "[t]he legislative history of the Act establishes that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 219, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). *Cf. AT&T Mobility LLC v. Concepcion,* 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011) (dismissing *Dean Witter* in *dicta* and stating that "the FAA was designed to promote arbitration").

**60.** *Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. ——, ——, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010).

**61.** *Rent–A–Center,* 561 U.S. at ——, 130 S.Ct. 2772 (*citing Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 443, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) and *Volt Information Sciences,* 489 U.S. at 478, 109 S.Ct. 1248).

**62.** *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).

the FAA."[63] But when a statute or common-law doctrine—which seems generally applicable to all contracts—is actually applied in a fashion that disfavors arbitration, the analysis of whether the statute or doctrine is preempted by the FAA becomes more complex. A state statute or doctrine stands as an obstacle to the purposes of the FAA if it targets arbitration provisions for disfavored treatment not applied to other contractual terms generally.[64] Similarly, a state law forms an obstacle to Section 2 of the FAA if it takes its "meaning from the fact that a contract to arbitrate is at issue, or frustrate[s] arbitration, or provide[s] a defense to it."[65] Nothing in the FAA "suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA's objectives."[66]

Since 1984, the United States Supreme Court has ruled that the FAA "appli[es] in state as well as federal courts" and "foreclose[s] state legislative attempts to undercut the enforceability of arbitration agreements."[67] The FAA also forecloses courts from, in effect, doing "what ... the state legislature cannot."[68]

■■■■■ While the first part of Section 2 of the FAA preempts state statutes and doctrines that deliberately impede the rights of private parties to agree to arbitration, under the savings clause of Section 2, general state contract principles still apply to assess whether those agreements to arbitrate are valid and enforceable, just as they would to any other contract dispute arising under state law. Under the savings clause, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2[.]"[69] "[A]rbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration."[70] As one court stated:

> Nothing in the Federal Arbitration Act overrides normal rules of contractual interpretation; the Act's goal was to put arbitration on a par with other contracts and eliminate any vestige of old rules disfavoring arbitration. Arbitration depends on agreement, and nothing beats normal rules of contract law to determine what the parties' agreement entails.[71]

"There is no denying that many decisions proclaim that federal policy favors arbitration, but this differs from saying that courts read contracts to foist arbitration on parties who have not genuinely agreed to that device."[72] Thus, while there is a strong and "liberal federal policy favoring arbitration agreements,"[73] such agreements must not be

63. *AT&T Mobility LLC v. Concepcion*, 563 U.S. at ——–——, 131 S.Ct. 1740 (*citing Preston v. Ferrer*, 552 U.S. 346, 353, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008)).

64. *Allied–Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. at 281, 115 S.Ct. 834.

65. *Securities Industry Ass'n v. Connolly*, 883 F.2d 1114, 1123 (1st Cir.1989).

66. *AT&T Mobility LLC v. Concepcion*, 563 U.S. at ——, 131 S.Ct. 1740.

67. *Southland Corp. v. Keating*, 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984). *See also, State ex rel. Clites v. Clawges*, 224 W.Va. 299, 304–305, 685 S.E.2d 693, 698–99 (2009) (*per curiam*) (citing *Southland*).

68. *AT&T Mobility LLC v. Concepcion*, 563 U.S. at ——, 131 S.Ct. 1740 (*citing Perry v. Thomas*, 482 U.S. 483, 493 n. 9, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987)).

69. *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). *See also, State ex rel. Saylor v. Wilkes*, 216 W.Va. at 773, 613 S.E.2d at 921 ("[T]his Court has found that arbitration clauses are subject to attack under state contract law principles."); *Spann v. American Express*, 224 S.W.3d 698, 698, 711 (Tenn.Ct.App.2006) (applicable grounds for refusing to enforce a contract include the defenses of laches, estoppel, waiver, fraud, duress and unconscionability).

70. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

71. *Stone v. Doerge*, 328 F.3d 343, 345 (7th Cir. 2003) (citations omitted).

72. *Id.*

73. *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (*quoting Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. at 24, 103 S.Ct. 927).

so broadly construed as to encompass claims and parties that were not intended by the original contract. "Allowing the question of the underlying validity of an arbitration agreement to be submitted to arbitration without the consent of all parties is contrary to governing law. It is also contrary to fundamental notions of fairness and basic principles of contract formation." [74]

▮▮▮▮ Hence, the U.S. Supreme Court has held there must be a "clear and unmistakable" intent of the parties for an arbitrator, rather than a court, to resolve a dispute.[75] "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." [76] Even though arbitration is favored, "there still must be an underlying agreement between the parties to arbitrate." [77] "The mantra that arbitration is always to be favored must not be mindlessly muttered. In some areas, arbitration is not appropriate; the protection of nursing home residents is certainly one area." [78] "[P]arties are only bound to arbitrate those issues that by clear language they have agreed to arbitrate; arbitration agreements will not be extended by construction or implication." [79] A party must clearly assent to arbitration before it can be forced into arbitration and denied access to the courts.[80] State law governs the determination of whether a party agreed to arbitrate a particular dispute.

▮▮▮▮ To reiterate, a court may invalidate an arbitration clause "upon such grounds as exist at law or in equity for the revocation of any contract" under Section 2 of the FAA. The U.S. Supreme Court has held:

> [S]tate law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the text] of § 2 [of the FAA].[81]

To be clear, "[c]ourts may not ... invalidate arbitration agreements under state laws applicable *only* to arbitration provisions." [82] "[A]ny rule of state law disfavoring or prohibiting arbitration for a class of transactions is preempted, save upon such grounds as exist at law or in equity for the revocation of any contract." [83]

▮▮▮▮ "The FAA ... envisions a limited role for courts asked to stay litigation and refer disputes to arbitration." [84] Hence, we have established the following procedure for

---

**74.** *Luna v. Household Finance Corporation III,* 236 F.Supp.2d 1166, 1173–74 (W.D.Wash.2002) (citation omitted).

**75.** *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

**76.** *First Options of Chicago, Inc., v. Kaplan,* 514 U.S. at 944, 115 S.Ct. 1920.

**77.** *Adkins v. Labor Ready, Inc.,* 303 F.3d at 501.

**78.** *Hayes v. Oakridge Home,* 122 Ohio St.3d 63, 74, 908 N.E.2d 408, 417–18 (2009) (Pfeifer, J., dissenting).

**79.** *State ex rel. City Holding Co. v. Kaufman,* 216 W.Va. 594, 598, 609 S.E.2d 855, 859 (2004) (*per curiam*) (quoting *Daimler Chrysler Corp. v. Franklin,* 814 N.E.2d 281, 285 (Ind.App.2004)).

**80.** *State ex rel. United Asphalt Suppliers, Inc. v. Sanders,* 204 W.Va. 23, 27–28, 511 S.E.2d 134, 138–39 (1998).

**81.** *Perry v. Thomas,* 482 U.S. at 492 n. 9, 107 S.Ct. 2520. We note that in *Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. at 281, 115 S.Ct. 834, the Court said that a trial court cannot apply a principle which says that "a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause." This assertion by the Court is simply wrong under Section 2 of the FAA. As we discuss later in this opinion, under the state, common-law doctrine of unconscionability that is applicable generally to all contracts, a contract may be fair enough to enforce some terms but not others.

**82.** *Doctor's Associates Inc. v. Casarotto,* 517 U.S. at 687, 116 S.Ct. 1652.

**83.** *Stone v. Doerge,* 328 F.3d at 345.

**84.** *Rent–A–Center,* 561 U.S. at ——, 130 S.Ct. 2772 (Stevens, J., dissenting).

courts to follow when a motion to compel arbitration has been filed:

> When a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement.[85]

Whether an arbitration agreement was validly formed is evaluated under state law principles of contract formation.

It is apparent that Congress intended for the FAA to serve *only* as a procedural statute for disputes brought in the federal courts.[86] Congress also intended the Act to govern only contracts between merchants with relatively equal bargaining power who voluntarily entered arbitration agreements. The FAA was designed to "cover contracts between people in different States who produced, shipped, bought, or sold commodities"—for instance, "[t]he farmer who will sell his carload of potatoes, from Wyoming, to a dealer in the State of New Jersey[.]"[87]

"Contrary to the intended purpose of the Federal Arbitration Act, the Supreme Court has steadily expanded the scope of the FAA since the 1980's."[88] With tendentious reasoning, the United States Supreme Court has stretched the application of the FAA from being a *procedural* statutory scheme effective only in the federal courts, to being a *substantive* law that preempts state law in both the federal *and* state courts.[89]

**85.** Syllabus Point 2, *State ex rel. TD Ameritrade, Inc., v. Kaufman*, 225 W.Va. 250, 692 S.E.2d 293 (2010). *See also*, Syllabus Point 5, *Ruckdeschel v. Falcon Drilling Co., L.L.C.*, 225 W.Va. 450, 693 S.E.2d 815 (2010) (extending *TD Ameritrade* beyond the FAA to all actions involving arbitration clauses, and holding that "[w]hen a circuit court is presented with the issue of whether an arbitration agreement is applicable, the court must determine the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred fall within the substantive scope of that arbitration agreement.").

**86.** An article written by several of the drafters of the FAA—Julius H. Cohen & Kenneth Dayton, "The New Federal Arbitration Law," 12 Va. L.Rev. 265, 275–76 (1926)—was apparently based upon a briefing given to Congress, and says this of the FAA:

> The statute as drawn establishes a procedure in the Federal courts for the enforcement of certain arbitration agreements. It is no infringement upon the right of each State to decide for itself what contracts shall or shall not exist under its laws. To be sure, whether or not a contract exists is a question of the substantive law of the jurisdiction wherein the contract was made.

*See also, Southland Corp. v. Keating*, 465 U.S. at 25, 104 S.Ct. 852 (O'Connor, J., dissenting) ("One rarely finds a legislative history as unambiguous as the FAA's. That history establishes conclusively that the 1925 Congress viewed the FAA as a procedural statute, applicable only in federal courts, derived, Congress believed, largely from the federal power to control the jurisdiction of the federal courts.").

**87.** *Prima Paint*, 388 U.S. at 409 n. 2, 87 S.Ct. 1801 (Black, J., dissenting) (citing and quoting

*Hearing on S. 4213 and S. 4214 before the Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess.*, 3, 7, 9, 10 (1923) and *Joint Hearings on S. 1005 and H.R. 646 before the Subcommittees of the Committees on the Judiciary*, 68th Cong., 1st Sess., 7 (1924)). *See also, M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) (approving an arbitration clause that "was made in an arm's-length negotiation by experienced and sophisticated businessmen").

**88.** Ann E. Krasuski, "Mandatory Arbitration Agreements Do Not Belong in Nursing Home Contracts with Residents," 8 DePaul J. Health Care L. 263, 271 (2004).

**89.** *See generally, Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984).

> Fifteen years ago, one commentator had this criticism of the Court's ever expanding interpretation of the FAA:
> [S]ome arbitration "agreements" so lack consent as to embarrass the courts.
> Imagine the potential for enforced arbitration throughout society if the courts treat new uses of arbitration clauses as they have securities arbitration "agreements." A customer purchases a coffee pot with a major credit card and signs the purchase form, which on the back contains an arbitration clause. If the *coffee pot ignites a fire that destroys his house* and kills members of his family, should he really be required to arbitrate a claim against the manufacturer? What if the customer buys the product via mail order? Is a written arbitration clause contained in the shipping box binding on the purchaser? . . .
> The average person's initial reaction to these suggestions is likely to be that this parade of

■■■ Further, the Supreme Court has created from whole cloth the doctrine of "severability," found in a line of cases under the FAA bearing on who decides the validity of an arbitration agreement. The doctrine begins with the premise that "an arbitration provision is severable from the remainder of the contract."[90] This doctrine is essentially a pleading standard: only if a party explicitly challenges the enforceability of an arbitration clause within a contract is a court then permitted to consider challenges to the arbitration clause.

■■■ The doctrine of severability means this: If a party challenges the enforceability of the entire contract (including the arbitration clause)—that is, the party does not sever the arbitration clause from the rest of the contract and make a "discrete

challenge to the validity of the arbitration clause"[91]—then the court is completely deprived of authority and only an arbitrator can assess the validity of the contract, including the validity of the arbitration clause.[92] This severability scheme has been expanded to the point that, if a contract is written with a "delegation provision" that delegates to an arbitrator the authority to resolve *any* dispute about the enforceability of the contract, then courts are deprived of even the right to weigh the enforceability of the arbitration clause; the arbitrator alone will have the authority to determine if the arbitration clause is valid—unless, of course, a party specifically challenges the delegation provision, in which case a court may decide if the delegation provision is unenforceable.[93]

horribles conjures the ridiculous. Perhaps. I hope so. But judicial treatment of consent issues found in securities arbitration and other arbitration contexts in recent years suggests no readily apparent means of distinguishing current application of the Federal Arbitration Act from the hypotheticals outlined above.

By drifting away from, or perhaps abandoning altogether, society's traditional notions of meaningful consent, the judiciary has slouched toward a Gomorrah of enforcing agreements that appear to lack real consent.... A legal system that glosses over serious questions of consent in its contract and dispute resolution jurisprudence reduces its claim to legitimacy and begins to look less like the Anglo–American system we have been raised to revere and more like totalitarian or other systems which place little emphasis on individual rights.

... In its zeal to expand the availability to compulsory arbitration as a partial solution to a perceived litigation caseload crisis, the Supreme Court has labored mightily to interpret the 1926 Federal Arbitration Act in an evolutionary manner that has expanded the scope and power of the Act.... [T]here is no denying that the expansion of arbitration has been substantially fueled ... through reinterpretation of the Act via a more flexible and evolutive form of statutory interpretation to which many judges and Justices claim not to subscribe.

... In its rush to empower arbitration, the Court has overlooked traditional bedrock values of our legal system: consent, unconscionability, disclosure, fairness and federalism.... This inconsistent approach has, among other things, reduced consent to a mere legal fiction, a shadow of its former self.
Jeffrey W. Stempel, "Bootstrapping and Slouching Toward Gomorrah: Arbitral Infatuation and the Decline of Consent," 62 Brook. L.Rev. 1381, 1383–1386 (1996). *See also,* Paul D. Carrington & Paul H. Haagen, "Contract and Jurisdiction,"

1996 Sup.Ct. Rev. 331, 380 ("the opinion of the Court was an extraordinarily disingenuous manipulation of the history of the 1925 Act," and "the Court relied almost wholly on its bogus legislative history" in holding the FAA applicable in state court.); Edward Brunet, "Toward Changing Models of Securities Arbitration," 62 Brook. L.Rev. 1459, 1469 'n. 33 (1996) ("The *Southland* decision is remarkable for its preemption holding that blatantly ignores legislative intent."); Robert A. Gorman, "The *Gilmer* Decision and the Private Arbitration of Public Law Disputes," 1995 U. Ill. L.Rev. 635, 677 n. 133 ("*Southland* has been persuasively criticized as a perversion of the legislative history of the Act, which rather clearly was intended to apply only to litigation in the federal courts."); and Stephen J. Ware, *Alternative Dispute Resolution* § 2.7, at 30 (2001) ("Unfortunately, *Southland* did not acknowledge the original understanding of the FAA as procedural law governing only in federal court.").

90. *Buckeye Check Cashing,* 546 U.S. at 445, 126 S.Ct. 1204.

91. *Preston v. Ferrer,* 552 U.S. at 354, 128 S.Ct. 978.

92. *See Prima Paint,* 388 U.S. at 403–404, 87 S.Ct. 1801; *Buckeye Check Cashing,* 546 U.S. at 444–446, 126 S.Ct. 1204; *Preston v. Ferrer,* 552 U.S. at 353, 128 S.Ct. 978 ("attacks on the validity of an entire contract, as. distinct from attacks aimed at the arbitration clause, are within the arbitrator's ken.").

93. *See generally, Rent–A–Center, West, Inc. v. Jackson,* 561 U.S. ——, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010). One commentator had this criticism of the Court's interpretation of sever-

When the scheme was created in 1967, Justice Black derided the severability doctrine as "fantastic." [94] In 2010, four dissenting justices joined in calling the doctrine "akin to Russian nesting dolls." [95]

A vocal minority of the Supreme Court has challenged these expansive interpretations of the FAA over the years, and as recently as 2010, members of the Court continued to suggest that the Court's interpretation of the FAA was neither supported by the law nor likely to be sustained in the future—assuming an intrepid litigant carried a coherent appeal of the question from a lower court to the Supreme Court.[96]

■ Assembling these various principles, we conclude that under Section 2 of the FAA, a written provision to settle by arbitration a controversy arising out of a contract that evidences a transaction affecting interstate commerce is valid, irrevocable, and enforceable, unless the provision is found to be invalid, revocable or unenforceable upon a ground that exists at law or in equity for the revocation of any contract.

Further, we hold that the purpose and objective of Section 2 of the FAA is for courts to treat arbitration agreements like any other contract. The Act does not favor or elevate arbitration agreements to a level of importance above all other contracts; it simply ensures that private agreements to arbitrate are enforced according to their terms.

■ A state statute, rule, or common-law doctrine, which targets arbitration provisions for disfavored treatment and which is not usually applied to other types of contract provisions, stands as an obstacle to the accomplishment and execution of the purposes

ability and delegation provisions in *Rent–A–Center:*

> A problem with just the arbitration provision? Goes to the court. A contractual defense challenging the validity of the contract as a whole? The arbitrator gets that one. Again, it's not clear why this should be the rule, and there is little in the Court's opinion that purports to explain why the rule is what it is....
>
> All you have to do to is argue that the provision of the relevant agreement mandating arbitration is unenforceable, and the court will decide the threshold arbitrability question. If you instead challenge the enforceability of a contract containing an arbitration provision as a whole, then the threshold arbitrability question goes to the arbitrator, and the watchmen, so to speak, are left to watch themselves.

Neal R. Troum, "Another View of *Rent–A–Center,* Arbitration and Arbitrability: Who is Watching the Watchmen?," 28 Alternatives to High Cost Litig. 184 (Oct.2010).

**94.** *Prima Paint,* 388 U.S. at 407, 87 S.Ct. 1801 (Black, J., dissenting).

**95.** *Rent–A–Center,* 561 U.S. at ——, 130 S.Ct. 2772 (Stevens, J., dissenting).

**96.** In her dissent in *Southland Corp. v. Keating,* 465 U.S. at 21, 104 S.Ct. 852, Justice O'Connor says that while Section 2 of the FAA does not identify which judicial forums are bound by its requirements, Section 3 suggests it only operates "in any of the courts of the United States," and Section 4 says in "any United States district court." She criticized the majority's creation of a "federal right in FAA § 2 that the state courts must enforce." 465 U.S. at 35, 104 S.Ct. 852.

Justice O'Connor reaffirmed her belief that "Congress never intended the Federal Arbitration Act to apply in state courts" in *Allied–Bruce Terminix Companies, Inc. v. Dobson,* 513 U.S. at 282, 115 S.Ct. 834 (O'Connor, J., concurring). Justice Thomas also concluded that the FAA "does not apply in state courts." 513 U.S. at 285, 115 S.Ct. 834 (Thomas, J., dissenting). Moreover, Justice Scalia agreed that *Southland* is "a permanent, unauthorized eviction of state-court power" and plainly stated:

> I shall not in the future dissent from judgments that rest on *Southland.* I will, however, stand ready to join four other Justices in overruling it, since *Southland* will not become more correct over time[.]

513 U.S. at 285, 115 S.Ct. 834 (Scalia, J., dissenting). *See also, Buckeye Check Cashing,* 546 U.S. at 449, 126 S.Ct. 1204 (2006) (Thomas, J., dissenting) ("I remain of the view that the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.,* does not apply to proceedings in state courts.... Thus, in state-court proceedings, the FAA cannot be the basis for displacing a state law that prohibits enforcement of an arbitration clause contained in a contract that is unenforceable under state law.").

In *Rent–A–Center,* 561 U.S. at ——, 130 S.Ct. 2772, Justice Scalia—writing for a slim majority of five justices—refers to the Court's jurisprudence on severance as "a line of cases neither party has asked us to overrule." The four dissenting justices, led by Justice Stevens, noted that while it has been suggested that the Court's jurisprudence on Section 2 is "inconsistent with the text of § 2 of the FAA ... as well as the intent of the draftsmen of the legislation," "neither party has asked us to revisit those cases." 561 U.S. at —— n. 8, 130 S.Ct. 2772 (Stevens, J., dissenting).

and objectives of Section 2 of the FAA and is preempted.

■ Additionally, nothing in Section 2 of the FAA overrides normal rules of contract interpretation. Generally applicable contract defenses—such as laches, estoppel, waiver, fraud, duress, or unconscionability—may be applied to invalidate an arbitration agreement.

And finally, we hold that under Section 2 of the FAA parties are only bound to arbitrate those issues that by clear and unmistakable writing they have agreed to arbitrate. An agreement to arbitrate will not be extended by construction or implication.

With these broad principles in mind, we turn to consider whether Section 15(c) of the Nursing Home Act is—under the Supreme Court's current interpretation of the FAA— preempted by Section 2 of the FAA.

First, the admission agreements are in writing, as required by Section 2 of the FAA. Second, there is substantial evidence that the nursing home admission agreements in question are contracts evidencing a transaction affecting interstate commerce under Section 2 of the FAA. The plaintiffs do not seriously contend that the transactions at issue do not have a significant impact upon interstate commerce. In the aggregate, the economic activities of these nursing home facilities have a significant impact on general practices subject to federal control, such as interstate commerce and transportation. Hence, the FAA applies to our examination of this case.

Third, we believe that Section 15(c) of the Nursing Home Act conflicts with the FAA's intended purpose of putting arbitration clauses on an equal footing with other contractual

clauses. By adopting Section 15(c), the West Virginia Legislature clearly intended for the right of a nursing home resident to pursue a civil action in court to be unwaivable, a right that the resident (or the resident's representative) could not be compelled to relinquish as a condition of admission to a nursing home. The Nursing Home Act is a comprehensive statutory scheme of *public* oversight of nursing homes, designed to ensure that the rights and dignity of nursing home residents are protected. Although arbitration may be an expeditious way of resolving some disputes, it is also a way for the nursing home industry to resolve violations of the Act out of the public's eye. The *Constitution,* however, preserves inviolate the right of any person to air their grievances in a public courtroom. In adopting Section 15(c), the Legislature intended that any suit to resolve subversions of a nursing home resident's rights and dignity would occur in a public forum. Arbitration clauses in nursing home admission agreements are clearly contrary to the Legislature's goal of full protection of the rights of nursing home residents.

Still, Section 15(c) singles out for nullification written arbitration agreements with nursing home residents, and does not apply to any other type of contractual agreements. It therefore is not a defense that exists at law or equity "for the revocation of *any* contract" under Section 2 of the FAA. There may be other types of agreements that Section 15(c) may operate to nullify, but the FAA preempts Section 15(c) from nullifying an existing, written, arms-length agreement reflecting a transaction in interstate commerce between a nursing home and a resident to arbitrate any dispute.[97] "State laws

---

**97.** Section 2 of the FAA applies to a written arbitration provision in "a contract," and preempts any state law, regulation or other action that would interfere with the arbitration portion of "a contract" freely entered into by all parties.

However, it is hornbook law that a contract consists of an offer and an acceptance, supported by sufficient consideration. *See* Syllabus Point 1, *First Nat. Bank of Gallipolis v. Marietta Mfg. Co.,* 151 W.Va. 636, 153 S.E.2d 172 (1967); Syllabus Point 5, *Virginian Export Coal Co. v. Rowland Land Co.,* 100 W.Va. 559, 131 S.E. 253 (1926). We do not believe that Section 2 would preclude

efforts by the Secretary of the Department of Health and Human Resources to enforce Section 15(c) of the Nursing Home Act against nursing home operators before a contract was ever formed with a resident. In other words, we believe the Secretary could enforce the Nursing Home Act and ensure that admission forms used by operators do not contain terms that are contrary to public policy. We are aware of only one other state (Oklahoma) that has attempted such regulation of nursing homes, but in that instance the state attempted to void existing contracts. A district court found that those existing contracts affected interstate commerce, and barred the Secretary from interfering with arbitration claus-

that are applicable to arbitration contracts and some other types of contracts, but not all contracts, are not grounds for the revocation of *any* contract." [98]

In conclusion, we hold that to the extent that Section 15(c) of the Nursing Home Act attempts to nullify and void any arbitration clause in a written contract, which evidences a transaction affecting interstate commerce, between a nursing home and a nursing home resident or the resident's legal representative, the statute is preempted by Section 2 of the Federal Arbitration Act.

### (3) Unconscionability

■ The plaintiffs contend that, notwithstanding the FAA, the arbitration clauses at issue are not enforceable because they are unconscionable. As our previous discussion made clear, while the FAA partially preempts Section 15(c) of the Nursing Home Act, the question of whether the arbitration clauses at issue are enforceable is still a matter of state contract law and capable of judicial review. [99]

There is a substantial body of case law from other jurisdictions involving nursing home admission agreements which, like the instant cases, have challenged whether an arbitration clause in the admission agreement was binding and enforceable. [100] A review of the numerous cases reveals that the enforceability of such an arbitration clause usually turns upon "the authority of the signor of the admissions agreement, the formatting of the agreement, the admissions process, and the fairness of the terms." [101] No jurisdiction has concluded that such arbitration clauses are unenforceable *per se*. Each jurisdiction has reached a different result based upon the unique facts and arguments presented in each case.

Of all the jurisdictions that we have examined, we find it important to note that "[t]he United States Supreme Court has not directly addressed the enforceability of an arbitration clause in a health care contract." [102] In fact, we cannot locate an instance where the United States Supreme Court has addressed the application of the FAA to an arbitration agreement in the context of a personal injury or wrongful death claim. [103] Accordingly, in

es in those contracts. *See Rainbow Health Care Center, Inc. v. Crutcher*, 2008 WL 268321 (N.D.Okla.2008).

**98.** *Carter v. SSC Odin Operating Co., LLC*, 237 Ill.2d 30, 48, 340 Ill.Dec. 196, 927 N.E.2d 1207, 1219 (2010). In *Carter*, the court concluded that an anti-waiver provision in a nursing home act similar to Section 15(c) was preempted by the FAA, because "the antiwaiver provisions of the [Illinois] Nursing Home Care Act purport to invalidate arbitration agreements in a specific type of contract—those involving nursing care—and for that reason alone they are not a defense generally applicable to 'any contract.'" *Id. See also, Canyon Sudar Partners, LLC v. Cole ex rel. Haynie*, 2011 WL 1233320 (S.D.W.Va.2011) ("in light of this broad policy favoring arbitration ... this Court finds that application of West Virginia Code § 16-5C-15(c) in this case is preempted by the FAA."); *Estate of Ruszala ex rel. Mizerak v. Brookdale Living Communities, Inc.*, 415 N.J.Super. 272, 293, 1 A.3d 806, 818-19 (2010) ("Our State's prohibition of arbitration agreements in nursing home contracts, designed to protect the elderly, is thus irreconcilable with our national policy favoring arbitration as a forum for dispute resolution. Under our federal system of government, national policy prevails. Therefore, the FAA's clear authorization nullifies the specific prohibition of arbitration provisions in nursing home or assisted living facilities' contracts contained in N.J.S.A. 30:13-8.1."); *Triad Health Management of Georgia, III, LLC v. Johnson*, 298

Ga.App. 204, 209, 679 S.E.2d 785, 790 (2009) (statute voiding pre-suit medical malpractice arbitration agreements was preempted by the FAA because it "singles out a specific class of arbitration agreement and restricts the enforcement thereof" and "is not a generally applicable contract defense.").

**99.** *State ex rel. Clites v. Clawges*, 224 W.Va. at 306, 685 S.E.2d at 700.

**100.** *See, e.g.,* Marjorie A. Shields, "Validity, Construction, and Application of Arbitration Agreement in Contract for Admission to Nursing Home," 50 A.L.R.6th 187 (2010).

**101.** Suzanne M. Scheller, "Arbitrating Wrongful Death Claims for Nursing Home Patients: What Is Wrong with this Picture and How to Make it 'More' Right," 113 Penn St. L.Rev. 527, 535 (2008).

**102.** Suzanne M. Scheller, "Arbitrating Wrongful Death Claims for Nursing Home Patients: What Is Wrong with this Picture and How to Make it 'More' Right," 113 Penn St. L.Rev. 527, 534 (2008).

**103.** In the modern era, the United State Supreme Court has, under the rubric of the FAA, interpreted the enforceability of arbitration clauses in suits involving a consulting agreement

considering whether the instant arbitration clauses are unconscionable, we must attempt to discern whether the FAA has any controlling effect upon an agreement, adopted prior to the occurrence of negligent conduct, to arbitrate a personal injury or wrongful death action.

■ The doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness, or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written.[104]

(*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)); an agreement between contractors (*Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968)); an international sales agreement (*Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)); various employment and collective-bargaining contracts (*U.S. Bulk Carriers, Inc. v. Arguelles*, 400 U.S. 351, 91 S.Ct. 409, 27 L.Ed.2d 456 (1971); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981); *Perry v. Thomas*, 482 U.S. 483, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *United Paperworkers Intern. Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Livadas v. Bradshaw*, 512 U.S. 107, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001); *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 122 S.Ct. 754, 151 L.Ed.2d 755 (2002); *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 129 S.Ct. 1456, 173 L.Ed.2d 398 (2009); *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. ——, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010); *Granite Rock Co. v. International Broth. of Teamsters*, 561 U.S. ——, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010)); a uranium supply agreement (*General Atomic Co. v. Felter*, 434 U.S. 12, 98 S.Ct. 76, 54 L.Ed.2d 199 (1977)); agreements with construction businesses (*Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983); *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *Cortez Byrd Chips, Inc. v. Bill Harbert Const. Co.*, 529 U.S. 193, 120 S.Ct. 1331, 146 L.Ed.2d 171 (2000)); franchise agreements (*Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)); broker/dealer contracts that implicated violations of federal securities law (*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *Shearson/American Exp., Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987); *Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)); contracts between manufacturers and dealers (*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)); a settlement agreement involving trademark infringement and unfair competition (*Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 114 S.Ct. 1992, 128 L.Ed.2d 842 (1994)); a termite control contract with a homeowner (*Allied–Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)); a debt repayment contract (*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)); a bill of lading (*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995)); a commercial reinsurance agreement between insurance companies (*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996)); a consumer financing agreement for a mobile home (*Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)); an employee benefit plan (*Rush Prudential HMO, Inc. v. Moran*, 536 U.S. 355, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002)); agreement between broker and customer (*Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002)); a commercial loan agreement (*Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) (*per curiam*)); a home improvement loan (*Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003)); a deferred deposit agreement (*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006)); an attorney-client fee contract (*Preston v. Ferrer*, 552 U.S. 346, 128 S.Ct. 978, 169 L.Ed.2d 917 (2008)); a lease (*Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008)); a contract with a credit cardholder (*Vaden v. Discover Bank*, 556 U.S. 49, 129 S.Ct. 1262, 173 L.Ed.2d 206 (2009)); an investment-management agreement ((*Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 129 S.Ct. 1896, 173 L.Ed.2d 832 (2009)); a standard maritime "charter party" contract (*Stolt–Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. ——, 130 S.Ct. 1758, 176 L.Ed.2d 605 (2010)); and a consumer cell phone contract (*AT&T Mobility LLC v. Concepcion*, 563 U.S. ——, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011)).

**104.** *McGinnis v. Cayton*, 173 W.Va. 102, 113, 312 S.E.2d 765, 776 (1984) ("Unconscionability means overall and gross imbalance, one-sidedness or lop-sidedness that justifies a court's refusal to enforce a contract as written.").

The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case.

■ In *McGinnis v. Cayton*, we noted that the equitable doctrine of unconscionability has long been applied in contract law, and quoted this definition from 1750 of what constitutes an unconscionable contract:

> It may be apparent from the intrinsic nature and subject of the bargain itself; such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other; which are unequitable and unconscientious bargains.... [105]

"Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." [106]

■ The purpose of the doctrine of unconscionability is one of equity and fairness. "Ordinarily, one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain. But when a party of little bargaining power, and hence little real choice, signs a commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms. In such a case the usual rule that the terms of the agreement are not to be questioned should be abandoned and the court should consider whether the terms of the contract are so unfair that enforcement should be withheld." [107]

■ Undertaking "[a]n analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole." [108] "A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and 'the existence of unfair terms in the contract.'" [109] "[T]he particular facts involved in each case are of utmost importance since certain conduct, contracts or contractual provisions may be unconscionable in some situations but not in others." [110]

■ The question of whether a bargain is unconscionable is a question of law. "Unconscionability is an equitable principle, and the determination of whether a contract or a provision therein is unconscionable should be made by the court." [111] Whether an unconscionable bargain occurred "is usually evaluated as of the time a contract is written, but not always.... In this ever-changing world one must be sensitive to the need to evolve rules to fit changed circumstances." [112] The burden of proving that a contract term is unconscionable rests with the party attacking the contract.

■ If a court, as a matter of law, finds a contract or any clause of a contract to be unconscionable, the court may refuse to enforce the contract, enforce the remainder of the contract without the unconscionable clause, or limit the application of any unconscionable clause to avoid any unconscionable result.

105. *McGinnis*, 173 W.Va. at 113, 312 S.E.2d at 776 (*quoting Hume v. United States*, 132 U.S. 406, 411, 10 S.Ct. 134, 33 L.Ed. 393 (1889), quoting *Earl of Chesterfield v. Janssen*, 28 Eng. Rep. 82, 100 (Ch. 1750)).

106. *Williams v. Walker–Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965).

107. *Id.*, 350 F.2d at 449–50 (footnotes omitted).

108. Syllabus Point 3, *Troy Min. Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749 (1986).

109. Syllabus Point 4, *Art's Flower Shop, Inc. v. Chesapeake and Potomac Telephone Co. of West*

*Virginia, Inc.*, 186 W.Va. 613, 413 S.E.2d 670 (1991).

110. Syllabus Point 2, *Orlando v. Finance One of West Virginia, Inc.*, 179 W.Va. 447, 369 S.E.2d 882 (1988).

111. Syllabus Point 1, *Troy Min. Corp. v. Itmann Coal Co.*, 176 W.Va. 599, 346 S.E.2d 749 (1986).

112. *McGinnis*, 173 W.Va. at 114, 312 S.E.2d at 777–78.

■ Under West Virginia law, we analyze unconscionability in terms of two component parts: procedural unconscionability and substantive unconscionability.

### (a) Procedural unconscionability

■ Procedural unconscionability addresses inequities, improprieties, or unfairness in the bargaining process and the formation of the contract.[113] "Procedural unconscionability has been described as the lack of a meaningful choice, considering all the circumstances surrounding the transaction including '[t]he manner in which the contract was entered,' whether each party had 'a reasonable opportunity to understand the terms of the contract,' and whether 'the important terms [were] hidden in a maze of fine print[.]' "[114] Procedural unconscionability involves a "variety of inadequacies, such as . . . literacy, lack of sophistication, hidden or unduly complex contract terms, bargaining tactics, and the particular setting existing during the contract formation process."[115] Determining procedural unconscionability also "requires the court to focus on the 'real and voluntary meeting of the minds' of the parties at the time that the contract was executed and consider factors such as: (1) relative bargaining power; (2) age; (3) education; (4) intelligence; (5) business savvy and experience; (6) the drafter of the contract; and (7) whether the terms were explained

to the 'weaker' party."[116] Considering factors such as these, courts are more likely to find unconscionability in consumer transactions and employment agreements than in contracts arising in purely commercial settings involving experienced parties.[117]

■ The courts of Tennessee recently examined cases interpreting arbitration agreements between patients and health care providers, and assessed whether those agreements were procedurally unconscionable. In so doing, the courts determined that, as a general observation, many such arbitration agreements create problems of procedural unconscionability:

> [I]n general, courts are reluctant to enforce arbitration agreements between patients and health care providers when the agreements are hidden within other types of contracts and do not afford the patients an opportunity to question the terms or purpose of the agreement. *This is so particularly when the agreements require the patient to choose between forever waiving the right to a trial by jury or foregoing necessary medical treatment*, and when the agreements give the health care provider an unequal advantage in the arbitration process itself.[118]

■ Procedural unconscionability often—but not always—begins with "a contract

---

113. *Id.*, 173 W.Va. at 114, 312 S.E.2d at 777.

114. *Nelson v. McGoldrick*, 127 Wash.2d 124, 131, 896 P.2d 1258, 1262 (1995) (*quoting Williams v. Walker–Thomas Furniture Co.*, 350 F.2d at 449.

115. *Muhammad v. County Bank of Rehoboth Beach, Delaware*, 189 N.J. 1, 15, 912 A.2d 88, 96 (2006).

116. *High v. Capital Senior Living Properties 2– Heatherwood, Inc.*, 594 F.Supp.2d 789, 799 (E.D.Mich.2008).

117. *See, Construction Associates, Inc. v. Fargo Water Equipment Co.*, 446 N.W.2d 237, 242 (N.D. 1989). Procedural unconscionability is very likely to arise in contracts of adhesion imposed as a condition of employment. *See, e.g., State ex rel. Saylor v. Wilkes*, 216 W.Va. 766, 613 S.E.2d 914 (2005). *Cf. State ex rel. Wells v. Matish*, 215 W.Va. 686, 600 S.E.2d 583 (2004) (*per curiam*) (employment agreement was customized to re-

flect plaintiff's unique circumstances). As one court said,

> contract terms imposed as a condition of employment are particularly prone to procedural unconscionability. In the case of preemployment arbitration contracts, the economic pressure exerted by employers on all but the most sought-after employees may be particularly acute, for the arbitration agreement stands between the employee and necessary employment, and few employees are in a position to refuse a job because of an arbitration requirement. Moreover, many employees may not give careful scrutiny to routine personnel documents that employers ask them to sign.

*Sonic–Calabasas A, Inc. v. Moreno*, 51 Cal.4th 659, 686, 121 Cal.Rptr.3d 58, 247 P.3d 130, 145 (2011) (quotes and citations omitted).

118. *Philpot v. Tennessee Health Management, Inc.*, 279 S.W.3d 573, 583 (Tenn.Ct.App.2007) (*quoting Buraczynski v. Eyring*, 919 S.W.2d 314, 321 (Tenn.1996)).

of adhesion, 'which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' "[119] " 'Adhesion contracts' include all 'form contracts' submitted by one party on the basis of this or nothing."[120]

"[T]he bulk of the contracts signed in this country are contracts of adhesion,"[121] and are generally enforceable because it would be impractical to void every agreement merely because of its adhesive nature. "There is nothing inherently wrong with a contract of adhesion. Most of the transactions of daily life involve such contracts that are drafted by one party and presented on a take it or leave it basis. They simplify standard transactions[.]"[122]

■■■ That said, the authors of the *Restatement of Contracts (Second)* recognized that most people simply do not read adhesive contracts, and are not expected to by the drafters of the contract:

> A party who makes regular use of a standardized form of agreement does not ordinarily expect his customers to understand or even to read the standard terms. One of the purposes of standardization is to eliminate bargaining over details of individual transactions, and that purpose would not be served if a substantial number of customers retained counsel and reviewed the standard terms. Employees regularly using a form often have only a limited understanding of its terms and limited authority to vary them. Customers do not in fact ordinarily understand or even read the standard terms. They trust

to the good faith of the party using the form and to the tacit representation that like terms are being accepted regularly by others similarly situated. *But they understand that they are assenting to the terms not read or not understood, subject to such limitations as the law may impose.*[123]

Hence, as we suggested in *State ex rel. Dunlap v. Berger*, "[f]inding that there is an adhesion contract is the beginning point for analysis, not the end of it; what courts aim at doing is distinguishing good adhesion contracts which should be enforced from bad adhesion contracts which should not."[124]

■■■ "The distinct body of law surrounding contracts of adhesion represents the legal system's effort to determine whether and to what extent such nonconsensual terms will be enforced."[125] One court suggested the following factors should be considered in determining whether a contract of adhesion is unconscionable:

> [I]n determining whether to enforce the terms of a contract of adhesion, courts have looked not only to the take-it-or-leave-it nature or the standardized form of the document but also to the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the "adhering" party, and the public interests affected by the contract.[126]

Procedural unconscionability may be found "in contracts of adhesion when there is an imbalance in bargaining power, absence of meaningful choice, unfair surprise, or sharp or deceptive practices (fine print, legalese

---

119. *Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 1070, 130 Cal.Rptr.2d 892, 63 P.3d 979, 983 (2003) (*quoting Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th 83, 113, 99 Cal.Rptr.2d 745, 6 P.3d 669, 689 (2000)).

120. *State ex rel. Dunlap v. Berger*, 211 W.Va. at 557, 567 S.E.2d at 273.

121. *State ex rel. Saylor v. Wilkes*, 216 W.Va. at 774, 613 S.E.2d at 922.

122. John D. Calamari, Joseph M. Perillo, *Hornbook on Contracts*, § 9.43 (6th Ed.2009).

123. *State ex rel. Dunlap v. Berger*, 211 W.Va. at 558, 567 S.E.2d at 274 (*quoting Mitchell v. Broadnax*, 208 W.Va. 36, 52, 537 S.E.2d 882, 898

(2000) (Starcher, J., concurring), *quoting Restatement of Contracts (Second)*, § 211, comment b [1981]).

124. *State ex rel. Dunlap v. Berger*, 211 W.Va. at 557, 567 S.E.2d at 273 (*quoting American Food Management, Inc. v. Henson*, 105 Ill.App.3d 141, 145, 61 Ill.Dec. 122, 434 N.E.2d 59, 62–63 (1982)).

125. *Rudbart v. North Jersey Dist. Water Supply Com'n*, 127 N.J. 344, 353–54, 605 A.2d 681, 686 (1992).

126. *Id.*, 127 N.J. at 356, 605 A.2d at 687.

disclaimers, or boilerplate clauses on the back of contracts, for examples)." [127] A contract of adhesion must be closely scrutinized to determine if it imposes terms beyond the reasonable expectations of an ordinary person, or oppressive or unconscionable terms, any of which will prevent enforcement of the agreement.[128]

 To summarize these principles, we hold that the doctrine of procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

 We also hold that a contract of adhesion is one drafted and imposed by a party of superior strength that leaves the subscribing party little or no opportunity to alter the substantive terms, and only the opportunity to adhere to the contract or reject it. A contract of adhesion should receive greater scrutiny than a contract with bargained-for terms to determine if it imposes terms that are oppressive, unconscionable or

beyond the reasonable expectations of an ordinary person.

### (b) Substantive unconscionability

 Substantive unconscionability involves unfairness in the contract itself—"overall imbalance, one-sidedness, *laesio enormis,* and 'the evils of the resulting contract' " [129]—and whether a contract term has "overly harsh or one-sided results" [130] or is "so one-sided as to lead to absurd results." [131] "The focus of the inquiry is whether the [contract] term is one-sided and will have an overly harsh effect on the disadvantaged party." [132] To determine substantive unconscionability, courts have focused on vague matters such as "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." [133]

 Some courts suggest that mutuality of obligation is the locus around which substantive unconscionability analysis revolves. "In assessing substantive unconscionability, the paramount consideration is mutuality." [134] "Agreements to arbitrate must contain at least 'a modicum of bilaterality' to avoid unconscionability." [135]

 However, in weighing the substantive unconscionability of an agreement, courts have been loath to adopt a bright-line set of considerations because "[t]he factors to be considered vary with the content of the agreement at issue." [136]

**127.** *McGinnis,* 173 W.Va. at 114, 312 S.E.2d at 777.

**128.** *See Buraczynski v. Eyring,* 919 S.W.2d 314, 320 (Tenn.1996).

**129.** *McGinnis,* 173 W.Va. at 114, 312 S.E.2d at 777 (footnote omitted).

**130.** *Sonic–Calabasas A, Inc. v. Moreno,* 51 Cal.4th at 685, 121 Cal.Rptr.3d 58, 247 P.3d at 145.

**131.** Syllabus Point 2, in part, *Ashland Oil, Inc. v. Donahue,* 159 W.Va. 463, 223 S.E.2d 433 (1976).

**132.** *Pokorny v. Quixtar, Inc.,* 601 F.3d 987, 997 (9th Cir.2010).

**133.** *NEC Technologies, Inc. v. Nelson,* 267 Ga. 390, 392, 478 S.E.2d 769, 772 (1996).

**134.** *Abramson v. Juniper Networks, Inc.,* 115 Cal. App.4th 638, 664, 9 Cal.Rptr.3d 422, 442 (2004).

**135.** *Id.,* 115 Cal.App.4th at 657, 9 Cal.Rptr.3d at 437 (2004).

**136.** *Hayes v. Oakridge Home,* 122 Ohio St.3d at 69, 908 N.E.2d at 414. *See also, Small v. HCF of Perrysburg, Inc.,* 159 Ohio App.3d 66, 71, 823 N.E.2d 19, 23 (Ohio App.2004) ("Because the determination of commercial reasonableness varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability.").

No single, precise definition of substantive unconscionability can be articulated. Substantive unconscionability refers to whether the terms of a contract are unreasonably favorable to the more powerful party. The analysis of substantive unconscionability requires looking at the contract terms and determining whether the terms are "commercially reasonable," that is, whether the terms lie outside the limits of what is reasonable or acceptable. The issue of unconscionability is considered "in the light of the general commercial background and the commercial needs." [137] Accordingly, courts should assess whether a contract provision is substantively unconscionable on a case-by-case basis.

 We hold that the doctrine of substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns. The sources for these "public policy concerns" can include "our federal and state constitutions, our public statutes, our judicial decisions, the applicable principles of the common law, the acknowledged prevailing concepts of the federal and state governments relating to and affecting the safety, health, morals and general welfare of the people for whom government—with us—is factually established." [138]

*(c) Interplay between procedural and substantive unconscionability*

 Procedural and substantive unconscionability often occur together, and the line

between the two concepts is often blurred. For instance, overwhelming bargaining strength against an inexperienced party (procedural unconscionability) may result in an adhesive form contract with terms that are commercially unreasonable (substantive unconscionability). One leading commentator has summarized the interplay between procedural and substantive unconscionability in this way:

The concept of unconscionability was meant to counteract two generic forms of abuses: the first of which relates to procedural deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms, today often analyzed in terms of whether the imposed-upon party had meaningful choice about whether and how to enter into the transaction; and the second of which relates to the substantive contract terms themselves and whether those terms are unreasonably favorable to the more powerful party, such as terms that impair the integrity of the bargaining process or otherwise contravene the public interest or public policy; terms (usually of an adhesion or boilerplate nature) that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law, fine-print terms or provisions that seek to negate the reasonable expectations of the nondrafting party, or unreasonably and unexpectedly harsh terms having to do with price or other central aspects of the transaction.

. . . The distinction between procedural and substantive abuses, however, may become quite blurred; overwhelming bargaining strength or use of fine print or incomprehensible legalese may reflect procedural unfairness in that it takes advantage of or surprises the victim of the

---

**137.** *Coady v. Cross Country Bank,* 299 Wis.2d 420, 440, 729 N.W.2d 732, 742 (Wis.App.2007). *See also, In re Checking Account Overdraft Litigation,* 734 F.Supp.2d 1279, 1284 (S.D.Fla.2010) ("There is no specific formula for analyzing substantive unconscionability; rather, it is a determination to be made in light of a variety of factors.").

**138.** *Cordle v. General Hugh Mercer Corp.,* 174 W.Va. 321, 325, 325 S.E.2d 111, 114 (1984). *See*

*also, Feliciano v. 7–Eleven, Inc.,* 210 W.Va. 740, 745, 559 S.E.2d 713, 718 (2001) (" 'Public policy' is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against public good even though no actual injury may have resulted therefrom in a particular case to the public."). The determination of a public policy is a question of law for the court. Syllabus Point 1, *Cordle v. General Hugh Mercer Corp., supra.*

clause, yet the terms contained in the resulting contract—whether in fine print or legal "gobbledygook"—would hardly be of concern unless they were substantively harmful to the nondrafting party as well. Thus, the fairness of the bargaining procedure—and hence, whether there is procedural unconscionability—may be of less importance if it results in harsh or unreasonable substantive terms, or substantive unconscionability may be sufficient in itself even though procedural unconscionability is not.[139]

We perceive that a contract term is unenforceable if it is both procedurally and substantively unconscionable. However, both need not be present to the same degree. Courts should apply a "sliding scale" in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa.[140]

### (d) Per se unconscionability of nursing home arbitration agreements

The plaintiffs assert that we should adopt a rule whereby we state that arbitration clauses in nursing home agreements are, *per se*, unconscionable. The plaintiffs argue that such clauses violate public policy as a matter of law, and are systemically unconscionable.

As we noted earlier in this opinion, the United States Supreme Court has never assessed whether, and how, the Federal Arbitration Act applies to personal injury or wrongful death actions that arise after the execution of an arbitration contract.

Here is our concern. On the one hand, nothing in the FAA overrides normal rules of contract interpretation. As a matter of general public policy, courts have repeatedly voided contracts through which one party has attempted to avoid responsibility for negligent conduct that causes a personal injury or wrongful death. But, on the other hand, the United States Supreme Court's expansive jurisprudence interpreting the FAA implies that arbitration contracts be interpreted to compel arbitration of allegations of negligent conduct only tangentially related to the contract, even if fundamental notions of fairness and state public policy were being abrogated.

The line of cases that we think is most analogous to nursing home arbitration clauses involves pre-injury contracts immunizing one party from liability for negligence toward another party. We first addressed such a contract in the 1991 case of *Murphy v. North American River Runners, Inc.*[141] The plaintiff was injured while whitewater rafting, when the commercial rafting guide engaged in a dangerous maneuver. The plaintiff brought suit against the whitewater rafting company, and the company defended the suit by producing a contract signed by the plaintiff wherein she agreed to accept the risk that she might be harmed while rafting.[142]

We examined the contract signed by the plaintiff, which we called "a pre-injury exculpatory agreement or anticipatory release."[143] We concluded that when a plaintiff expressly and clearly "agrees to accept a risk of harm arising from the defendant's negligent or reckless conduct," the plaintiff may not re-

---

**139.** 8 Richard A. Lord, *Williston on Contracts* § 18.10 (4th ed.2010) (footnotes omitted).

**140.** *See, e.g., Armendariz v. Foundation Health Psychcare Services, Inc.*, 24 Cal.4th at 114, 99 Cal.Rptr.2d 745, 6 P.3d at 690 ("unconscionability has both a 'procedural' and a 'substantive' element, the former focusing on 'oppression' or 'surprise' due to unequal bargaining power, the latter on 'overly harsh' or 'one-sided' results. The prevailing view is that [procedural and substantive unconscionability] must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree. Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves. In other words, the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.") (*quotations and citations omitted*).

**141.** *Murphy v. North American River Runners, Inc.*, 186 W.Va. 310, 412 S.E.2d 504 (1991).

**142.** 186 W.Va. at 314, 412 S.E.2d at 508.

**143.** Syllabus Point 2, *Murphy v. North American River Runners, Inc., supra.*

cover for the harm *"unless the agreement is invalid as contrary to public policy."* [144] "When such an express agreement is freely and fairly made, between parties who are in an equal bargaining position, *and there is no public interest with which the agreement interferes,* it generally will be upheld." [145] We went on to find in *Murphy* that the pre-injury exculpatory agreement signed by the plaintiff was invalid as a matter of public policy, because the Legislature had statutorily imposed standards of care upon the white-water rafting industry for the protection of participants, and the agreement attempted to exempt the defendant from these statutory standards. [146]

We again addressed a clause in an agreement exempting a party from liability in *Kyriazis v. University of West Virginia.* [147] The plaintiff, a college student, claimed that he was injured while playing rugby for a university rugby club. When he brought suit, the university said it was immune because· the plaintiff, prior to his injury, had signed a contract waiving any and all claims "arising from my participation in rugby club activities." [148] The plaintiff asserted that the contract was void as against public policy.

In Syllabus Point 2 of *Kyriazis,* we concluded that such agreements are unenforceable on grounds of public policy if they protect a party with a duty of "public service":

> A clause in an agreement exempting a party from tort liability is unenforceable on grounds of public policy if, for example, (1) the clause exempts a party charged with a duty of public service from tort liability to a party to whom that duty is owed, or (2) the injured party is similarly a member of a class that is protected against the class to which the party inflicting the harm belongs.

In expanding upon the first factor of this test, we suggested that a "public service" is one that exhibits some or all of the following characteristics:

> (1) it concerns a business of a type generally thought suitable for public regulation;
> (2) the party seeking exculpation is engaged in performing a service of great importance to the public and which is often a matter of practical necessity for some members of the public;
> (3) such party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards;
> (4) because of the essential nature of the service, and the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks such service;
> (5) in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees to obtain protection against negligence;
> (6) the person or property of members of the public seeking such services must be placed under the control of the furnisher of the services, subject to the risk of carelessness on the part of such furnisher or its servants. [149]

We went on to conclude that athletics are an integral and important element of a university education that qualifies as a "public service." In reasoning reflecting unconscionability analysis, we also concluded that the university "possessed a decisive bargaining advantage over the appellant when he executed the Release," and therefore found the contract void as against public policy. [150]

144. 186 W.Va. at 314–15, 412 S.E.2d at 508–09 (emphasis added).

145. 186 W.Va. at 315, 412 S.E.2d at 509.

146. 186 W.Va. at 317–18, 412 S.E.2d at 511–12.

147. *Kyriazis v. University of West Virginia,* 192 W.Va. 60, 450 S.E.2d 649 (1994).

148. 192 W.Va. at 63 n. 1, 450 S.E.2d at 652 n. 1.

149. *Kyriazis,* 192 W.Va. at 65, 450 S.E.2d at 654 (citing *Tunkl v. Regents of University of California,* 60 Cal.2d 92, 99–100, 32 Cal.Rptr. 33, 383 P.2d 441, 444–46 (1963).

150. *Kyriazis,* 192 W.Va. at 66, 450 S.E.2d at 655.

The above-listed characteristics of a "public service" were originally set forth in the leading case of *Tunkl v. Regents of University of California*.[151] In *Tunkl*, the plaintiff was admitted to a hospital and was required to sign an admission agreement that released the hospital "from any and all liability for the negligent or wrongful acts or omissions of its employees[.]"[152] The California court applied the public service factors, and found that the hospital's "prearranged exculpation from its negligence" adversely affected the public interest and could not be enforced.[153] A motivating factor for the court was, in essence, the unconscionability of the situation:

> In this situation the releasing party does not really acquiesce voluntarily in the contractual shifting of the risk, nor can we be reasonably certain that he receives an adequate consideration for the transfer. Since the service is one which each member of the public, presently or potentially, may find essential to him, he faces, despite his economic inability to do so, the prospect of a compulsory assumption of the risk of another's negligence.[154]

The general rule to be derived from *Tunkl* is that "public policy disfavors clauses exculpating liability for negligence, and a court must closely scrutinize such clauses."[155] Agreements absolving public service entities from responsibility for their negligence will not be enforced by the courts. Only agreements absolving participants and proprietors from liability during hazardous recreational activities with no general public utility—such as skiing, parachuting, paintball, or horseback trail rides—will tend to be enforceable (but subject to willful misconduct or statutory limitations).[156]

We turn now to the problem at hand: pre-injury contracts that, ostensibly, require any suit that involves the injury or death of a party to the contract to be diverted from the courts and into binding arbitration. If a party to any pre-dispute contract was to assert a contractual right to avoid liability for their negligent conduct, then we would give the transaction careful examination. Likewise, if a party to a pre-dispute contract asserts a right to avoid courtroom scrutiny of their negligent conduct that caused a personal injury or wrongful death, then such a contract also warrants a wary examination.

We recognize that a rule of state law disfavoring arbitration for a class of interstate commercial transactions is preempted by the FAA. However, Congress did not intend for the FAA to be, in any way, applicable to personal injury or wrongful death suits that only collaterally derive from a written agreement that evidences a transaction affecting interstate commerce, particularly where the agreement involves a service that is a practical necessity for members of the public.

We are not alone in this belief. The parties inform us that various arbitration groups—including the American Arbitration Association—refuse to arbitrate certain personal injury and wrongful death claims where the arbitration agreement was signed *before* negligence occurred. Many groups now only arbitrate personal injury and wrongful death claims where the agreement was signed *after* negligence occurred, and the parameters of the liability and damages could be clearly understood by the parties.

In the instant cases, we conclude that the arbitration clauses at issue plainly involve a public service as defined in *Kyriaz-*

---

**151.** *Tunkl v. Regents of University of California,* 60 Cal.2d 92, 32 Cal.Rptr. 33, 383 P.2d 441 (1963).

**152.** 60 Cal.2d at 94, 32 Cal.Rptr. 33, 383 P.2d at 442.

**153.** 60 Cal.2d at 104, 32 Cal.Rptr. 33, 383 P.2d at 449.

**154.** 60 Cal.2d at 101, 32 Cal.Rptr. 33, 383 P.2d at 446–47.

**155.** *Schutkowski v. Carey,* 725 P.2d 1057, 1060 (Wyo.1986).

**156.** *See Schutkowski v. Carey,* 725 P.2d at 1060 ("Private recreational businesses generally do not qualify as services demanding a special duty to the public, nor are their services of a highly special, highly necessary nature.").

*is, supra.* The nursing home industry is subject to stringent state and federal regulations, and nursing homes are of importance and practical necessity to the public. Furthermore, by adopting the Nursing Home Act, the West Virginia Legislature plainly intended for actions involving violations of the dignity and well-being of nursing home residents to be publicly aired in the courts. Only by having to publicly account for their misfeasance or malfeasance is a defendant likely to mend his, her, or its ways. For that reason, the Legislature attempted to wholly prohibit nursing homes from compelling residents to give up their right to seek justice in a public forum.[157]

▮▮▮ Congress did not intend for arbitration agreements, adopted prior to an occurrence of negligence that results in a personal injury or wrongful death, and which require questions about the negligence be submitted to arbitration, to be governed by the Federal Arbitration Act. We therefore hold that, as a matter of public policy under West Virginia law, an arbitration clause in a nursing home admission agreement adopted prior to an occurrence of negligence that results in a personal injury or wrongful death, shall not be enforced to compel arbitration of a dispute concerning the negligence.

## IV.

### Application of the Law to Each Case

An Ohio court recently said:

The fact that a resident is signing an arbitration agreement contemporaneously with being admitted into a nursing home is troubling. By definition, an individual being admitted into a nursing home has a physical or mental detriment that requires them to need the assistance of a nursing home. Further, the reality is that, for many individuals, their admission to a

nursing home is the final step in the road of life. As such, this is an extremely stressful time for elderly persons of diminished health.[158]

Like the Ohio court, we too are troubled by the admission agreements in the instant cases. The three residents in this case were admitted to the defendants' nursing home facilities, not because they wanted to be, but because they needed to be admitted as a result of physical and mental impairments. As a general matter, it was a stressful and confusing time for each resident's family. And buried in each admission agreement was an arbitration clause compelling each resident to give up their constitutional right to access to the courts to air their grievances.

As we discuss below, we find that, as a matter of public policy, the arbitration clauses—which were signed prior to the alleged occurrence of negligence that resulted in the person injury or wrongful death of a nursing home resident—cannot be enforced to compel arbitration of the underlying disputes. As two of the drafters of the FAA said, "Not all questions arising out of contracts ought to be arbitrated."[159] Alternatively, we find that two of the three arbitration clauses are, as a matter of law, unconscionable and unenforceable against the plaintiffs. In the third case, the circuit court did not consider the conscionability of the agreement, and only certified a question regarding the preemption of Section 15(c) of the Nursing Home Act by the FAA. Lastly, in the case of Clarence Brown, we address the circuit court's order dismissing the plaintiff's claims against landlord Canoe Hollow Properties.

### (1) Clarence Brown, No. 35494

In an order dated August 26, 2009, the circuit court dismissed the plaintiff's action against defendants Marmet Health Care Center, Inc., and Robin Sutphin. The circuit court concluded that the plaintiff was required to arbitrate all of his claims against

---

157. There is nothing in the law or public policy, however, that stops a resident, *after negligence has occurred,* and after the parameters of risk are better defined, from voluntarily entering into a contract separate and apart from the admission agreement to arbitrate any claims arising from the negligence.

158. *Wascovich v. Personacare of Ohio,* 190 Ohio App.3d 619, 624, 943 N.E.2d 1030, 1034 (Ohio App.2010) (*quoting Manley v. Personacare of Ohio,* 2007 WL 210583, at ¶ 29).

159. Julius H. Cohen, Kenneth Dayton, "The New Federal Arbitration Law," 12 Va.L.Rev. at 281.

these two defendants. Additionally, in an order dated May 15, 2009, the circuit court dismissed the plaintiff's claims against defendant Canoe Hollow Properties.

 In both orders, we note that the circuit court failed to state any findings of fact or conclusions of law that would assist in appellate review of the orders. In both orders, the circuit court said its cursory decision was based on some variant of the "motion, briefs, record and argument of counsel." Although our standard of review remains *de novo*, a circuit court's order dismissing a case "must set out factual findings sufficient to permit meaningful appellate review. Findings of fact, by necessity, include those facts which the circuit court finds relevant, determinative of the issues and undisputed." [160] Without factual or legal findings, this Court is greatly at sea without a chart or compass in making a determination as to whether the circuit court's decision was right or wrong.[161] In both of its orders, the circuit court failed to offer any substance to permit a meaningful review of the court's decision, and for that reason alone both orders must be reversed. Still, we will proceed to a *de novo* review of the record.

 In this case, plaintiff Clayton Brown signed an arbitration clause with Marmet Health Care Center on behalf of his brother, Clarence Brown. The plaintiff asserts that, as a matter of public policy, the arbitration clause in his brother's admission agreement is unenforceable. We agree because, as we stated earlier, arbitration clauses in nursing home admission agreements—which were signed prior to the alleged occurrence of negligence that resulted in the person injury or wrongful death of a nursing home resident—cannot be enforced to compel arbitration of a later negligence action against the nursing home.

 Alternatively, the plaintiff argues that the arbitration clause is procedurally unconscionable because it is a contract of adhesion that conditioned further medical treatment on acceptance of the arbitration clause. Clarence Brown had been a resident of Marmet Health Care Center for eight years before the plaintiff was asked to sign a new admission agreement that contained the challenged arbitration clause. The arbitration clause was not explained to the plaintiff, he did not have an attorney present, and did not have any particularized legal or commercial experience when the agreement was signed. Giving careful scrutiny to the adhesive admission agreement, and considering the relative positions of the parties, the adequacy of their bargaining positions, and the manner in which the agreement was adopted, we agree with the plaintiff that the arbitration clause is procedurally unconscionable.

Furthermore, we do not discern from the record that the plaintiff had any meaningful alternative other than to sign the admission agreement. The defendant asserts that a quick search of the phone book will reveal numerous other nursing homes as "alternatives." However, we see nothing to indicate that those other nursing homes were meaningful alternatives, because there is nothing suggesting those other nursing homes had available bed space for Mr. Brown, offered services that Mr. Brown needed for his treatment, or did not have contracts that contained arbitration clauses similar to that in the defendants' admission agreement. These factors lend further credence to the procedural unconscionability of the defendants' arbitration clause.

 The plaintiff further asserts that the clause is substantively unconscionable because it gives the nursing home the unilateral right to proceed in any forum it chooses to collect money due or to have a resident forcibly discharged, but limits residents' claims to arbitration. We agree with the plaintiff that the arbitration clause is substantively uncon-

**160.** Syllabus Point 3, *Fayette County National Bank v. Lilly,* 199 W.Va. 349, 484 S.E.2d 232 (1997).

**161.** *See, Workman v. Workmen's Compensation Com'r,* 160 W.Va. 656, 662, 236 S.E.2d 236, 240 (1977) ("W.Va.Code, 23–5–3, requires the Appeal Board to state in writing its reasons for its or-

der.... Without such record findings of an administrative agency, the Court on judicial review is greatly at sea without a chart or compass in making its determination and adjudication as to whether the agency decision is plainly right or clearly wrong.").

scionable, because there is no modicum of bilaterality. Further, we see nothing in the agreement allowing residents or their representatives to reject the arbitration clause. By signing the agreement that is required for admission, the resident or representative was required to agree to the arbitration clause.

Further, we find troubling the fee requirements for filing an arbitration claim. The fee to file a civil lawsuit in West Virginia is currently $145.00, and the fee to file a medical professional liability action is $260.00.[162] The plaintiff points out that the clause says that the party submitting a claim to arbitration is "solely responsible for payment of the initial arbitration filing fee." While the clause specified that the filing fee is in a schedule set by the American Arbitration Association, the fee schedule was not provided to Clarence or Clayton Brown. Currently, the standard initial arbitration filing fee—which is based upon the amount of money the claimant thinks is in dispute—ranges from $975 for claims below $10,000, to $8,700 for claims worth between $500,000 and $1,000,000.[163] We believe that these fees, in the context of an action for negligence by a nursing home, are an unconscionable bar to relief.

Lastly, we do not believe that the arbitration clause is a commercially reasonable contract term, in that it is beyond the reasonable expectations of an ordinary person. This is, in part, because the term clearly violates public policy. A reasonable individual being admitted, or admitting a loved one, to a nursing home would expect the admission agreement to pertain to the services to be rendered by the nursing home, and to the payment of those services by the resident, the resident's family, or by private or government insurers. Section 15(c) of the aforementioned West Virginia Nursing Home Act contains a clear statement of public policy, namely that nursing homes are not to require residents to sign agreements that waive the right to commence a civil action, a right that is preserved in the West Virginia *Constitution*. A reasonable individual would, therefore, not expect that the admission agreement would anticipate carelessness by the nursing home, and not expect the agreement to require a nursing home resident to waive the right to commence a civil action in favor of a non-public arbitration forum for evaluating that carelessness. Taken together, these factors too establish the substantive unconscionability of the arbitration clause signed by the plaintiff.

After carefully examining the arbitration clause—in this appeal and in the appeal of the case of Leo Taylor, *infra*—we agree with the plaintiff that the clause, taken as a whole, is unconscionable and unenforceable. The circuit court's August 25, 2009 dismissal order must therefore be reversed.

■ Additionally, the plaintiff asserts that the circuit court erred in dismissing defendant Canoe Hollow Properties. The defendant contends that Canoe Hollow was nothing more than the owner of the land and building where Marmet Health Care Center operated its business. As evidence, it produced a copy of a lease dated January 31, 2003 which stated that the relationship between Canoe Hollow and Marmet Health Care Center "shall be that of landlord and tenant and that [Canoe Hollow] has no ownership in [Marmet Health Care Center's] enterprise."

The plaintiff, argues that, in reality, Canoe Hollow owned, operated, managed and/or controlled the nursing home. For instance, the plaintiff asserts that Canoe Hollow is permitted to inspect the nursing home's "financial and accounting records at such reasonable times as [Canoe Hollow] may desire." At a minimum, the plaintiff asserts the right to conduct discovery on Canoe Hollow's motion to dismiss.

■ We once said,

---

**162.** *See W.Va.Code,* 59–1–11(a) [2010].

**163.** *See* American Arbitration Association, *Commercial Arbitration Rules and Mediation Procedures* (2010). The standard fee for claims in excess of $10,000,000 are calculated as a percentage of the claim's value, but is "Capped at $65,000." The standard initial filing fee for a non-monetary claim, such as an order for injunctive relief, is $4,600.

Generally, a motion to dismiss should be granted only where it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. For this reason, motions to dismiss are viewed with disfavor, and we counsel lower courts to rarely grant such motions.[164]

In reviewing a motion to dismiss, a circuit court is required to accept as true all the well-pleaded allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.[165] A complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [166]

After consideration of the record, we agree with the plaintiff that the circuit court erred in granting Canoe Hollow's motion to dismiss. The circuit court failed to consider the allegations stated in the plaintiff's complaint, and accepted the defendant's proffered evidence [167] as final and true.

Accordingly, we must reverse the circuit court's May 15, 2009 order dismissing Canoe Hollow Properties as well.

### (2) Leo Taylor, No. 35546

In an order dated September 29, 2009, the circuit court dismissed the plaintiff's action against the various owners, operators and employees of Marmet Health Care Center, and ordered that the plaintiff's claims be submitted to arbitration.

In this case, Leo Taylor was admitted to Marmet Health Care Center, and an admission agreement was signed by his wife. After Mr. Taylor died, and later his wife died, the plaintiff brought the instant suit on behalf of Mr. Taylor's estate. On appeal, the plaintiff contends that the arbitration clause in Marmet Health Care Center's admission agreement—identical to the one in the case of Clarence Brown—is unconscionable and wholly unenforceable.

As a general matter, we find that the arbitration clause signed by Mrs. Taylor is unenforceable as a matter of public policy. Arbitration clauses in nursing home admission agreements—which were signed prior to the alleged occurrence of negligence that resulted in the person injury or wrongful death of a nursing home resident—cannot be enforced to compel arbitration of a later negligence action against the nursing home.

Further, the plaintiff makes many of the same arguments for unconscionability that we found compelling in Mr. Brown's case, *supra*. The plaintiff also asserts that the admission agreement signed by Mrs. Taylor is procedurally unconscionable, because it consists of thirteen pages of closely spaced type in small font, with blank spaces to fill in the parties' names or to check specific options. Standing alone, we would not find this fact persuasive.

However, when it is considered together with the argument that Mrs. Taylor was not given a way to reject the arbitration clause, it tips the scale toward a finding of procedural unconscionability. The final section of the agreement contains a check list to be completed by the resident (or his representative) confirming that, purportedly, the most important terms of the agreement have been explained to and reviewed by the resident or representative. This check list covers such elements as noting the resident has "received information relating to beauty and barber services." The list does not contain an entry

**164.** *Ewing v. Board of Educ. of County of Summers,* 202 W.Va. 228, 235, 503 S.E.2d 541, 548 (1998) (citations omitted).

**165.** *Conrad v. ARA Szabo,* 198 W.Va. 362, 369–70, 480 S.E.2d 801, 808–09 (1996).

**166.** Syllabus Point 3, in part, *Chapman v. Kane Transfer Co., Inc.,* 160 W.Va. 530, 236 S.E.2d 207 (1977).

**167.** The circuit court's actions were plainly error. We decline to further discuss the fact that, by weighing the defendant's evidence in a motion to dismiss, the circuit court should have converted the motion into one for summary judgment. *See W.Va.R.Civ.Pro.* Rule 12(b)(6) (if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

indicating that the arbitration clause was explained, reviewed, or that Mrs. Taylor knew what rights were being waived. Combined with Mrs. Taylor's lack of sophistication and advanced age, we believe that the circuit court erred in enforcing the arbitration clause in the admission agreement.

Accordingly, the circuit court's September 29, 2009 order must be reversed.[168]

### (3) Pauline Virginia Willett, No. 35635

In an order dated February 24, 2010, the circuit court certified a detailed question to this Court concerning the interplay between Section 2 of the Federal Arbitration Act and Section 15(c) of the West Virginia Nursing Home Act. This Court retains the power to reformulate a question certified by a circuit court.[169] We reframe the question as such:

Is West Virginia Code § 16-5C-15(c), which provides in pertinent part that "[a]ny waiver by a resident or his or her representative of the right to commence an action under this section, whether oral or in writing, shall be null and void as contrary to public policy," preempted by the Federal Arbitration Act, 9 U.S.C. § 2

**168.** In 1993, Mr. Taylor executed a medical power of attorney giving his wife authority to make "decisions relating to medical treatment, surgical treatment, nursing care, medication, hospitalization, care and treatment in a nursing home or other facility, and home health care." The plaintiff asserts that there is no evidence in the record indicating that the medical power of attorney gave Mrs. Taylor the authority to sign away her husband's—and now, her husband's wrongful death beneficiaries'—right to pursue relief in a courtroom.

*Amicus curiae* West Virginia Association for Justice also suggests, as a general matter, that one way to challenge the arbitration clauses at issue in the instant cases is by establishing that the signor of the admission agreement did not have the authority to waive the resident's right to bring a lawsuit. As the Association argues in its brief,

It is unconscionable for a patient in need of care to be forced to make this decision-choosing between the protections of the law and potentially life itself. It is completely out-of-bounds to claim that a mere representative of the prospective patient can waive fundamental rights in such circumstances.

We have apparently never examined this question in West Virginia.

There is some support, however, for this position. In *State ex rel. United Asphalt Suppliers, Inc. v. Sanders*, 204 W.Va. 23, 511 S.E.2d 134 (1998), we examined a parallel question: whether a non-signatory to an arbitration clause could be required to arbitrate a claim that derived from a contract. In Syllabus Point 3, we said that "[a] court may not direct a nonsignatory to an agreement containing an arbitration clause to participate in an arbitration proceeding absent evidence that would justify consideration of whether the nonsignatory exception to the rule requiring express assent to arbitration should be invoked." *See also, Thomson–CSF, S.A. v. American Arbitration Ass'n*, 64 F.3d 773, 776 (2nd Cir.1995) (there are "a number of theories under which nonsignatories may be bound to the arbitration agreements of others. Those theories arise out of common law principles of contract and agency law. Accordingly, we have recognized five theo-

ries for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel."); *Thompson v. Witherspoon*, 197 Md.App. 69, 87–88, 12 A.3d 685, 696 (2011) ("Where a non-signatory benefits from the contractual relation of parties to an agreement but not the agreement itself, the non-signatory has not 'directly benefitted;' hence an arbitration clause will not have binding effect. Similarly, an abstract advantage gained from the contract, intangible or indefinite, will not compel a non-signatory to arbitrate." (Citations omitted)).

Other jurisdictions have usually concluded that either representatives of prospective nursing home resident did not have the clear authority to sign the arbitration agreement, or have concluded that beneficiaries of a wrongful death action on the resident's behalf—as nonsignatories—were not bound by arbitrate their claims. *See generally, Mt. Holly Nursing Center v. Crowdus*, 281 S.W.3d 809 (Ky.App.2008) (health care surrogate did not have apparent authority to consent to arbitration); *Sennett v. National Healthcare Corp.*, 272 S.W.3d 237 (Mo.App.2008) (in wrongful death action, beneficiaries were not bound by arbitration agreement signed by patient); *High v. Capital Senior Living Properties 2–Heatherwood, Inc.*, 594 F.Supp.2d 789 (E.D.Mich.2008) (estate was not bound by arbitration clause in agreement not signed by resident); *Stalley v. Transitional Hospitals Corp. of Tampa, Inc.*, 44 So.3d 627 (Fla.App.2010) (estate was not bound by arbitration agreement signed by resident's wife); *Davis v. Kindred Healthcare Operating, Inc.*, 2011 WL 1467212 (Tenn.Ct.App. 2011) (because patient gave niece and husband a power of attorney with joint agency, arbitration agreement signed by only the niece was not enforceable). *But see, Canyon Sudar Partners, LLC v. Cole ex rel. Haynie*, 2011 WL 1233320 (S.D.W.Va.2011) (arbitration agreement signed by daughter with medical power of attorney was enforceable).

**169.** *See W.Va.Code*, 51–1A–4 [1996]; Syllabus Point 3, *Kincaid v. Mangum*, 189 W.Va. 404, 432 S.E.2d 74 (1993).

when a nursing home resident's representative has, as part of the nursing home's written admission documents that reflect a transaction in interstate commerce, executed an arbitration agreement?

The circuit court, in a lengthier version of this question, answered "yes" and found that Section 15(c) was preempted. As we have already discussed in full previously in Section III(C)(2), we agree with the circuit court, and also answer the certified question "yes." [170]

We note, however, our holding that Congress did not intend for arbitration agreements, adopted prior to an occurrence of negligence that results in a personal injury or wrongful death, and which require questions about the negligence to be submitted to arbitration, to be governed by the Federal Arbitration Act. On remand, the circuit court should therefore determine that, as a matter of public policy under West Virginia law, the arbitration clause in Ms. Willett's admission agreement—adopted prior to the alleged violation of the nursing home's duties under West Virginia law that caused her death—should not be enforced to compel arbitration of the plaintiff's allegations.

## V.

### Conclusion

#### (1) No. 35494, Clarence Brown

In Case No. 35494, the circuit court's May 15, 2009 and August 25, 2009 orders are reversed, and the case is remanded for further proceedings.

Reversed and remanded.

#### (2) No. 35546, Leo Taylor

In Case No. 35546, the circuit court's September 29, 2009 order is reversed, and the case is remanded for further proceedings.

Reversed and remanded.

#### (3) No. 35635, Pauline Virginia Willett

In Case No. 35636, the circuit court's certified question is, as reformulated, answered "Yes."

Certified question answered.

Justice DAVIS, deeming herself disqualified, did not participate.

Justice BENJAMIN, deeming himself disqualified, did not participate.

Judge GAUJOT, sitting by temporary assignment.

## Appendix 1

### Arbitration Clause In The Admission Agreement Used By

#### Marmet Health Care Center, Inc.

MANDATORY ARBITRATION:

Except for Facility's efforts to collect monies due from Resident and Facility's option to discharge Resident for such failure, which the parties agree may be heard by a Court of competent jurisdiction in the city or county where the Facility is located, all disputes and disagreements between Facility and Resident (or their respective successors, assigns or representatives) arising out of the enforcement or interpretation of this Agreement or related hereto or the services provided by Facility hereunder including, without limitation, allegations by Resident of neglect, abuse or negligence which the Resident and Facility are unable to resolve between themselves shall be submitted to binding arbitration in accordance with the *Commercial Arbitration Rules* of the American Arbitration Association then in effect. The party filing the arbitration (making a claim) shall be solely responsible for payment of the initial arbitration filing fee in accordance with the Rules of the American Arbitration Association fee schedules. The arbitrator or arbitrators shall be entitled to award recovery of the arbitration fees, attorney's fees and out-of-pocket expenses incurred by the prevailing party up to a maximum award of $5000. The

---

**170.** The plaintiff in Ms. Willett's case did not raise any additional challenges to the arbitration clause other than arguing it was void under Section 15(c) of the Nursing Home Act. On re-

mand, we leave it to the parties to determine whether the clause may be challenged on some other ground.

arbitrator shall also have the authority to issue interlocutory and final injunctive relief. The arbitrator's decision shall be binding on the parties and conclusive as to the issues addressed, and may be entered as a judgment in a court of competent jurisdiction and not subject to further attack or appeal except in instances of fraud, coercion or manifest error. During the pendency of any arbitration proceeding, Facility and Resident shall continue to perform their respective obligations under this Agreement subject, however, to the right of either party to terminate this Agreement as established herein. The obligation of Facility and Resident to arbitrate their disputes or disagreements shall survive termination of this Agreement.

## Appendix 2

Arbitration Clause In The Admission Agreement Used By

*Clarksburg Nursing & Rehabilitation Center, Inc.*
RESIDENT AND FACILITY ARBITRATION AGREEMENT
READ CAREFULLY

It is understood and agreed by *burg [sic] Nursing and Rehabilitation Center* (the "Facility") and *Pauline Willett* ("Resident," or "Resident's Representative", hereinafter collectively the "Resident") that any legal dispute, controversy, demand or claim (hereinafter collectively referred to as "claim" or "claims") that arises out of or relates to the Resident Admission Agreement or any service or health care provided by the Facility to the Resident, shall be resolved exclusively by binding arbitration to be conducted at a place agreed upon by the parties, or in the absence of such agreement, at the Facility, in accordance with the Code of Procedure of the National Arbitration Forum ("NAF") which is hereby incorporated into this Agreement,* and not by a lawsuit or resort to court process except to the extent that applicable state or federal law provides for judicial review of arbitration proceedings or the judicial enforcement of arbitration awards.

This Arbitration Agreement includes, but is not limited to, any claim for payment, non-payment or refund for services rendered to the Resident by the Facility, violations of any right granted to the Resident by law or by the Resident Admission Agreement, breach of contract, fraud or misrepresentation, negligence, gross negligence, malpractice, or any other claim based on any departure from accepted standards of medical or health care or safety whether sounding in tort or in contract. However, this Arbitration Agreement shall not limit the Resident's right to file a grievance or complaint, formal or informal, with the Facility or any appropriate state or federal agency.

The parties agree that damages awarded, if any, in an arbitration conducted pursuant to this Arbitration Agreement shall be determined in accordance with the provisions of the state or federal law applicable to a comparable civil action, including any prerequisites to, credit against or limitations on, such damages.

It is the intention of the parties to this Arbitration Agreement that it shall inure to the benefit of and bind the parties, their successors and assigns, including the agents, employees and servants of the Facility, and all persons whose claim is derived through or on behalf of the Resident, including that of any parent, spouse, child, guardian, executor, administrator, legal representative, or heir of the Resident.

All claims based in whole or in part on the same incident, transaction, or related course of care or services provided by the Facility to the Resident, shall be arbitrated in one proceeding. A claim shall be waived and forever barred if it arose prior to the date upon which notice of arbitration is given to the Facility or received by the Resident, and is not presented in the arbitration proceeding.

THE PARTIES UNDERSTAND AND AGREE THAT BY ENTERING THIS ARBITRATION AGREEMENT THEY ARE GIVING UP AND WAIVING THEIR CONSTITUTIONAL RIGHT TO HAVE ANY CLAIM DECIDED IN A COURT OF LAW BEFORE A JUDGE AND A JURY.

The Resident understands that (1) he/she has the right to seek legal counsel concerning this Arbitration Agreement, (2) the execution of this Arbitration Agreement is not a pre-

condition to the furnishing of services to the Resident by the Facility, and (3) this Arbitration Agreement may be rescinded by written notice to the Facility from the Resident within 30 days of signature. If not rescinded within 30 days, this Arbitration Agreement shall remain in effect for all care and services subsequently rendered at the Facility, even if such care and services are rendered following the Resident's discharge and readmission to the Facility.

This Arbitration Agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. §§ 1–16.

* Information regarding NAF, its arbitration services, fees for services and Code of Procedure is available at: National Arbitration Forum, P.O. Box 50191, Minneapolis, MN 55405, Phone (800) 474–2371/FAX: (651) 604–6778, *www.arbitration-forum.com.*